<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————— :
:
**DAVID WATSON, individually and as** :
**Executor of the ESTATE OF NANCY** :
**CLARE GIMENEZ-WATSON,** :
:     **Civil Action No. 10-230 (KM)**
**Plaintiff,** :
:
**v.** :
:
**SUNRISE SENIOR LIVING** :     **OPINION**
**SERVICES, INC. d/b/a BRIGHTON** :
**GARDENS OF EDISON, ET AL.,** :
:
**Defendants.** :
————————————————————:

**HAMMER, United States Magistrate Judge**

    This matter comes before the Court by way of plaintiff David Watson's ("plaintiff" or

"Watson") motion for leave to file a Second Amended Complaint to add claims for piercing the

corporate veil and liability based on the participation theory, and his motion to compel various

discovery responses.  In conjunction with plaintiff's motion, the Court here also considers a

cross-motion for a protective order, filed by defendants Sunrise Senior Living Services, Inc.,

d/b/a Brighton Gardens of Edison ("Services" or "Brighton Gardens") and Sunrise Senior Living,

Inc. ("SSLI") (collectively, "defendants").

    The Court held oral argument on plaintiff's motion and defendants' cross-motion on

January 7, 2013.  For the reasons set forth below, plaintiff's motion for leave to file a Second

Amended Complaint is granted in part and denied in part, plaintiff's motion to compel various

discovery responses is granted in part, and defendants' cross-motion for a protective order is

denied without prejudice.

I.   **FACTUAL BACKGROUND**

For purposes of the motion to amend, the Court must accept as true all well pleaded allegations in the proposed amended complaint.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Plaintiff brings this action individually and as Executor on behalf of his mother, Nancy Clare Gimenez-Watson ("Gimenez-Watson"), and on behalf of Gimenez-Watson's wrongful death beneficiaries.  (Proposed Second Am. Compl. ¶¶ 1–2, Sept. 13, 2012, ECF No. 97-3).  On March 25, 2006, Gimenez-Watson entered Brighton Gardens, an assisted living facility, nursing home, and long-term adult care facility, as a "resident,"[1] and she "received continuous and ongoing nursing care and medical treatment through April 11, 2008."  (Id. ¶¶ 3, 13, 16).  Gimenez-Watson suffered from various medical conditions, including dementia, and she moved into Brighton Gardens so that its medical professionals and nursing staff could care adequately for her.  (Id. ¶¶ 18–19).  Through the duration of her residency at Brighton Gardens, Gimenez-Watson was "under the exclusive care, custody, treatment, rehabilitation and management of [defendants] and their employees and agents."  (Id. ¶ 17).

In April and May 2006, Gimenez-Watson was prescribed multiple medications[2] for her increasingly errant behavior, which included confusion, talking to herself, crawling on the floor, and visual hallucinations.  (Id. ¶ 20).  On February 19, 2007, however, her use of those

---

[1] A "resident" is "any individual receiving extended medical or nursing treatment or care at a nursing home."  N.J.S.A. 30:13-2(e); see also N.J.A.C. 8:39-1.2 (defining "resident" as "a person who resides in [a long-term care] facility and is in need of 24-hour continuous nursing supervision").

[2] Those medications were Aricept and Namenda.  (Id. ¶¶ 20–21).

2

medications was discontinued because she had entered the "advanced stages" of dementia.  (Id. ¶ 21).  Plaintiff alleges that the physicians, nurses, technicians, certified nursing assistants, paramedical employees, and dieticians at Brighton Gardens knew of Gimenez-Watson's progressive dementia and "that such progression would require increased attention and care by the staff at Brighton Gardens."  (Id. ¶ 22).  Still, plaintiff alleges, from March 26, 2007 to May 10, 2007, Gimenez-Watson suffered severe weight loss as a result of her progressive dementia.  (Id. ¶¶ 23–24).

Plaintiff alleges that despite Gimenez-Watson's progressive dementia, "the staff at Brighton Gardens failed to record any nurse's notes between October 20, 2007 and April 11, 2008."  (Id. ¶ 25).  On April 11, 2008, Brighton Gardens transferred Gimenez-Watson to JFK Medical Center after she choked while eating scalloped potatoes, which plaintiff attributes to the Brighton Gardens staff's failure to assess properly her dietary needs, prepare her food, and supervise her during meals.  (Id. ¶¶ 26–27).  Plaintiff alleges that the staff also failed to notify Gimenez-Watson's physician of the choking incident, and defendants did not notify the New Jersey Department of Health and Senior Services of the choking incident.  (Id. ¶¶ 28–29).  Further, plaintiff alleges that the health care providers at Brighton Gardens "willfully and improperly failed" to update Gimenez-Watson's medical records to reflect why she was transferred to JFK Medical Center on April 11, 2008, and they did not note the corrective action needed to prevent future such incidents.  (Id. ¶ 30).

Upon Gimenez-Watson's return to Brighton Gardens on April 11, 2008, plaintiff alleges that the staff failed to inform her dietician of the choking incident, obtain a speech therapy consultation, provide her with adequate supervision while she ate, prepare her food in a manner

3

that would prevent choking, and monitor the effects of Zyprexa[3] on her ability to swallow.  (Id. ¶¶ 32–35).  Plaintiff alleges that on April 1, 2008, Gimenez-Watson fell while being assisted to the toilet and three hours later in the dining room, but a nurse did not note those falls until April 12, 2008.  (Id. ¶ 36).  He alleges that Gimenez-Watson fell twice again on April 16 and April 17, 2008, but the staff failed to ensure that she was receiving care necessary to prevent future "life-threatening incidents."  (Id. ¶¶ 37–39).  On April 26, 2008, plaintiff alleges, Gimenez-Watson suffered a second choking incident after the Brighton Gardens staff "allowed her to eat whole pieces of meat [that] had been improperly prepared and given to her while she was unattended in the dining room."  (Id. ¶ 40).  As a result of that choking incident, Gimenez-Watson collapsed and paramedics eventually removed two large pieces of meat from her oropharynx.  (Id. ¶ 44).  She died on April 27, 2008, at JFK Medical Center.  (Id. ¶ 45).  However, plaintiff alleges that the Brighton Gardens staff "willfully and intentionally failed to make any contemporaneous entry" in Gimenez-Watson's medical chart regarding the second choking incident until April 28, 2008, one day after she passed away.  (Id. ¶ 42).  Plaintiff alleges that the staff willfully and intentionally removed from Gimenez-Watson's medical chart the transfer form (that is, the form transferring her from Brighton Gardens to JFK Medical Center) regarding the April 26, 2008, choking incident.  (Id. ¶ 43).

## II.   PROCEDURAL HISTORY

On November 25, 2009, plaintiff filed a six-count Complaint against defendants in the Superior Court of New Jersey, Law Division, Middlesex County, alleging (1) violations of the New Jersey Nursing Home Bill of Rights, N.J.S.A. 30:13-1 et seq. and the Federal Nursing

---

[3] Zyprexa is associated with swallowing dysfunction.  (Id. ¶ 35).

4

Home Reform Amendments of 1987, 42 U.S.C. §§ 1395i and 1396r; (2) gross negligence; (3) negligence; (4) medical malpractice and professional negligence; (5) wrongful death; and (6) deprivation of civil rights under 42 U.S.C. § 1983.  (Exh. A to Notice of Removal, Jan. 14, 2010, ECF No. 1).  Plaintiff also filed a Demand for the Production of Complete Certified Copies of Medical and Nursing Records; a Demand for Answers to Form C and Form C3 Interrogatories; and an Affidavit of Merit in support of his medical malpractice and professional negligence claims.  (Id.).  On January 14, 2010, defendants removed this action to the United States District Court, District of New Jersey.  (Notice of Removal, ECF No. 1).

On January 21, 2010, each individual defendant filed an Answer.  (See Answers, Jan. 21, 2010, ECF Nos. 3–9).  On February 10, 2010, SSLI and Services each filed an Amended Answer.  (See Am. Answers, Feb. 10, 2010, ECF Nos. 11–12).  The Court held a scheduling conference on March 22, 2010, and issued a Pretrial Scheduling Order pursuant to Federal Rule of Civil Procedure 16.  (Pretr. Sched. Order., Mar. 22, 2010, ECF No. 22.).  The Pretrial Scheduling Order set an October 15, 2010, deadline for fact discovery, and a July 1, 2010, deadline to add new parties or amend the pleadings.  (Id. ¶¶ 1–3).

On April 27, 2010, defendants John Gaul, Lisa Mayr, James Pope, Daniel Schwartz, and Susan Timoner ("individual defendants") filed a motion to dismiss the Complaint for lack of jurisdiction.  (Mot. to Dismiss, Apr. 27, 2010, ECF No. 39).  On that same date, defendants filed a motion to dismiss the Complaint for lack of prosecution.  (Mot. to Dismiss, Apr. 27, 2010, ECF No. 42).  In response, on May 24, 2010, plaintiff filed a cross-motion for leave to amend the Complaint.  (Cross-mot., May 24, 2010, ECF No. 49).  In support of that cross-motion, plaintiff filed a brief (ECF No. 50) and a proposed First Amended Complaint (ECF No. 51-11).  On

5

October 13, 2010, the individual defendants and defendants filed a letter withdrawing their then-pending motions to dismiss (ECF Nos. 39 and 42) and consenting to plaintiff's cross-motion to amend the Complaint, without prejudice to their right to re-file motions to dismiss or to file answers.  (Letter, Oct. 13, 2010, ECF No. 68).  Thus, the Court deemed plaintiff's proposed First Amended Complaint (ECF No. 51-11) filed as of October 14, 2010.  (Order, ECF No. 69).  Plaintiff's First Amended Complaint asserted the same counts as his original Complaint.  (Compare ECF No. 51-11, with Exh. A to Notice of Removal, Jan. 14, 2010, ECF No. 1).

On November 3, 2010, the Court held a status conference with the parties and issued an Order adjusting certain discovery deadlines, but not modifying the date (July 1, 2010) set forth in the Pretrial Scheduling Order for a party to amend the pleadings.  (Order, Nov. 3, 2010, ECF No. 72).  Additional status conferences were held on January 31, 2011 (ECF No. 78), August 3, 2011 (ECF No. 80), October 27, 2011 (ECF No. 82), and January 24, 2012 (ECF No. 84), but none of the corresponding Orders changed the deadline by which a party could amend the pleadings.  (Orders, ECF Nos. 78, 80, 82, 84–85).  On April 19, 2012, however, plaintiff filed a motion for leave to engage in discovery of SSLI regarding its role as a parent corporation of Services and whether SSLI "may justly assert the corporate shield to insulate it from liability for the acts and omissions of Services."  (Br. in Support of Pl.'s Mot. for Discovery, Apr. 19, 2012, ECF No. 87-1).  Defendants filed a brief in opposition (ECF No. 88) to plaintiff's motion for discovery, and plaintiff filed responses in support of his motion (ECF Nos. 89–90).  Consequently, the parties appeared before the Court for a discovery hearing on July 12, 2012, and the Court ordered "discovery limited to alter ego theory of liability, jurisdictional discovery and the deposition of two EMT's only is open through October 30, 2012."  (Order, July 12, 2012, ECF No. 92).  The

6

Court also ordered that "[a]pplications to compel discovery and in support of a motion to amend the complaint shall be filed by August 30, 2012. . . ." (Id.).  Thereafter, on August 17, 2012, the Court extended the deadline for applications in support of a motion to amend the complaint until September 13, 2012.  (Consent Order, Aug. 17, 2012, ECF No. 96).

Plaintiff then filed the instant motion for leave to file a Second Amended Complaint and to compel various discovery responses.  (Mot. to Am. Compl., Sept. 13, 2012, ECF No. 97). Specifically, plaintiff's proposed Second Amended Complaint (ECF No. 97-3) includes new claims to pierce the corporate veil (Count Six) and for liability under the participation theory and N.J.A.C. 8:36-5.2(c) (Count Seven).  (Proposed Second Am. Compl., Sept. 13, 2012, ECF No. 97-3 at 21–23).  Plaintiff also seeks the following discovery: (1) that the Court compel SSLI to serve answers to plaintiff's interrogatories and to respond to plaintiff's third request for documents; (2) that the Court compel Services to provide more complete answers to plaintiff's interrogatories and third request for documents; and (3) that the Court allow plaintiff to depose Bradley B. Rush, former Chief Financial Officer (CFO) of SSLI, regarding the alter ego theory of liability as it relates to SSLI and Services, and for Rule 30(b)(6) depositions on the same issue.[4] (Br. in Support of Pl.'s Mot. for Leave to File Second Am. Compl., Sept. 13, 2012, ECF No. 97-1 at 8–10).

On September 27, 2012, defendants filed the instant cross-motion for a protective order

---

[4] At oral argument on January 7, 2013, defendants argued that plaintiff seeks to depose Rush to preserve his testimony for trial, not for fact discovery purposes.  Plaintiff argued that he seeks to depose Rush for both discovery and to preserve his testimony for trial.  The Court concludes that plaintiff seeks to depose Rush both for discovery purposes, including to discover information that Rush knows first-hand versus information derived from other sources, and to preserve his testimony at trial.

pursuant to Fed. R. Civ. P. 26(c), 26(b)(1) and (c), 26(b)(2)(b), and 26(c)(7),[5] and in opposition to plaintiff's motion for leave to amend and to compel various discovery responses.  (Cross-mot., Sept. 27, 2012, ECF No. 99).

**III.   PARTIES' ARGUMENTS**

    **A.   PLAINTIFF WATSON'S ARGUMENTS**

        **1.   MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

Plaintiff contends that he has made out a prima facie case as to SSLI's "domination and control" of Services, which warrants the Court granting leave for him to file a Second Amended Complaint to add claims on piercing the corporate veil and liability under the participation theory.[6]  (Br. in Support of Pl.'s Mot. for Leave to File Second Am. Compl., ECF No. 97-1 at 6–7).  As such, plaintiff asserts that the Court should freely grant leave for him to file a Second Amended Complaint because his proposed amended claims – alter ego liability and liability under the participation theory – are not futile.  (See id.; see also Fed. R. Civ. P. 15(a)(2)).

Specifically, plaintiff alleges that SSLI "exercised control over Services and Brighton Gardens to such a degree as to make it an alter ego of those entities."  (ECF No. 97-1 at 6).  He

---

[5] Defendants refer mistakenly to this Rule as "Rule 26(c)(7)," rather than "Rule 26(c)(1)(G)."  For the remainder of this Opinion, the Court will refer to the Rule by its correct designation, Rule 26(c)(1)(G).

[6] Plaintiff analyzes whether the Court should grant leave for him to file a Second Amended Complaint through the lens of Federal Rule of Civil Procedure 15(a)(2).  (Br. in Support of Pl.'s Mot. for Leave to File Second Am. Compl., Sept. 13, 2012, ECF No. 97-1 at 6–7).  The crux of plaintiff's argument is that the Court should freely grant leave because he seeks to add two new claims – alter ego liability and liability under the participation theory – that are not futile.  (See id.).  For the reasons discussed in Part IV, A of this Opinion, plaintiff uses the proper analytical framework – analysis under Fed. R. Civ. P. 15 – to determine whether the Court should grant him leave to file a Second Amended Complaint.

claims that Services "has no independent role, but is merely an instrumentality of [SSLI]" and that it "exists solely for the purpose of shielding [SSLI] from liability in lawsuits for wrongful death and injury." (Id.). In support of those allegations, plaintiff relies on the declaration of Thomas S. Howard, who "bring[s] documentary and other evidence to the Court's attention in support of plaintiff's motion [] for leave to file a Second Amended Complaint." (Decl. of Thomas S. Howard, Esq. ("Howard Decl."), ¶ 1, Sept. 13, 2012, ECF No. 97-2). In particular, Howard incorporates by reference certain declarations and exhibits that were filed previously (see ECF No. 87) "in support of plaintiff's motion for leave to conduct discovery of defendants on the issues that are the subject of the proposed Second Amended Complaint." (Howard Decl. ¶ 3, ECF No. 97-2). Howard incorporates by reference the October 16, 2007, declaration of Bradley B. Rush, former CFO of SSLI, which Howard filed previously in support of plaintiff's motion for leave to conduct discovery, and which Rush himself executed in connection with an unrelated California state court case, Adams v. Villa Valencia Health Care Center, et al., No. 05CC13119, Cal. Super. Ct., Orange Cnty. (filed Dec. 14, 2005) (hereinafter "Adams"). (See Rush Decl., ECF No. 87-3).

Rush declared that from July 14, 2003 to May 2, 2007, he worked in various corporate roles for SSLI and Services, and eventually became CFO of SSLI and President and Sole Director of Services. (Id. ¶¶ 3–4). Rush stated that during his tenure at SSLI and Services, those companies "each acted as the *alter ego* of the other" and that SSLI "completely dominated and controlled the activities and finances" of Services. (Id. ¶ 5). He maintained that the "overwhelming bulk of [his] activities were performed on behalf of [SSLI]" and that "the only duties [he] performed on behalf of [Services] was simply to sign license applications." (Id. ¶ 6).

9

In fact, Rush declared that Services did not function as an independent company; rather, it "functioned as little more than an applicant for, and as a name to place on, an assisted living facility . . . license." (Id. ¶¶ 8–9). Further, he stated that SSLI "set the operational and strategic course" for Services, "made decisions as to how to balance funds" between it and Services, "decided the scope and range of services that were to be offered at Sunrise facilities or communities[,]" and decided "what the contents of the articles of incorporation or bylaws of . . . Services would be." (Id. ¶¶ 11, 14–15, 17). Rush also declared that the Chief Operating Officer of SSLI "had the authority to hire or fire any staffer at any facility or community in the Sunrise system." (Id. ¶ 19). Thus, relying on the Rush Declaration, plaintiff here submits that he has set forth a prima facie claim of alter ego liability sufficient to warrant the Court granting leave for him to amend the Complaint and add the Proposed Sixth Count on piercing the corporate veil. (ECF No. 97-1 at 3, 6–7).

In addition to the Rush Declaration, Howard incorporates by reference excerpts from the May 14, 2008, trial testimony of Richard J. Nadeau, another former CFO of SSLI, which, like the Rush Declaration, was given originally in Adams. (See Howard Decl. ¶ 3, Apr. 19, 2012, ECF No. 87-2; Nadeau Test., ECF No. 87-4). In that case, Nadeau testified that Services does not maintain separate financial records from SSLI and that funds from SSLI facilities (such as Villa Valencia) are funneled into "one central depository" controlled by SSLI. (Nadeau Test., ECF No. 87-4). He also declared that SSLI decides "the scope and range of services that will be offered" and the vendors and contractors that will be used at the individual facilities it controls. (Id.). Plaintiff submits that Nadeau's trial testimony supports a prima facie claim of alter ego liability sufficient to warrant the Court granting leave for plaintiff to amend the Complaint and

add the Proposed Sixth Count on piercing the corporate veil.[7]  (ECF No. 97-1 at 3, 6–7).

Finally, with respect to the participation theory, plaintiff argues that he has made out a prima facie claim of liability under that theory because he has demonstrated that SSLI is a "corporate officer" of Services.  (Id. at 7).  Specifically, Howard incorporates by reference copies of web pages maintained on the New Jersey Department of Health and Senior Services website, which indicate that SSLI is a corporate officer of Brighton Gardens of Edison.  (See ECF No. 87-5).  As a corporate officer, plaintiff asserts that SSLI "may be held personally liable for all torts Services committed, even though acting as an officer of a corporation."  (ECF No. 97-1 at 7) (citing Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303 (2002)).  Thus, plaintiff argues that the Court should allow him to add the Proposed Seventh Count alleging liability under the participation theory.  (Id. at 6–7).

### 2.   MOTION TO COMPEL VARIOUS DISCOVERY RESPONSES

In addition to his motion for leave to file a Second Amended Complaint, plaintiff seeks to compel the following discovery:  (1) that the Court compel SSLI to serve answers to plaintiff's interrogatories and to respond to plaintiff's third request for documents; (2) that the Court compel Services to provide more complete responses to plaintiff's interrogatories and third request for documents; and (3) that the Court allow plaintiff to depose Bradley B. Rush and designated representatives of SSLI pursuant to plaintiff's Fed. R. Civ. P. 30(b)(6) notice.  (See Br. in Support of Pl.'s Mot. for Leave to File Second Am. Compl., ECF No. 97-1 at 8–10).

First, plaintiff argues that the Court should compel SSLI to respond to plaintiff's

---

[7] Howard also incorporates by reference eighteen (18) additional exhibits, documents, and testimonies in support of plaintiff's motion for leave to file a Second Amended Complaint.  (See Howard Decl. ¶ 3, Sept. 13, 2012, ECF No. 97-2).

interrogatories (ECF No. 97-5) and third request for production of documents (ECF No. 97-4) because the Court expressly permitted plaintiff to engage in discovery as to the alter ego theory of liability and SSLI's jurisdictional defense.  (ECF No. 97-1 at 8; see Order ¶¶ 1, 4, July 13, 2012, ECF No. 92).  Thus, plaintiff alleges that SSLI "should be ordered to provide a complete response without further delay."  (ECF No. 97-1 at 8).  Second, plaintiff contends that the Court should compel Services to provide more complete answers to plaintiff's interrogatories nos. 1, 5, 6, 7, and 8 (see ECF No. 97-6 for Services's responses to those interrogatories) and more complete answers to plaintiff's third request for production of documents nos. 1, 5–7, 9, 10–11, 15, 17–19, 23, 25–27, 32, 36, and 41–42 (see ECF No. 97-7 for Services's responses to those document requests) because, in both instances, Services's answers are "woefully deficient and incomplete."  (ECF No. 97-1 at 8).  Third, plaintiff asserts that the Court should allow him to depose Bradley Rush and designated SSLI representatives because the Court's July 13, 2012, Order permits discovery on the alter ego theory of liability.  (Id. at 9–10; Order ¶ 1, ECF No. 92).

### B.   DEFENDANTS' ARGUMENTS

#### 1.   OPPOSITION TO PLAINTIFF'S PROPOSED SECOND AMENDED COMPLAINT

Defendants argue the Court should deny plaintiff's motion for leave to file a Second Amended Complaint because plaintiff cannot satisfy one of the essential elements necessary for the Court to pierce the corporate veil:  the existence of manifest injustice.  (Br. in Opp'n to Pl.'s Mot. for Leave to File a Second Am. Compl., Sept. 27, 2012, ECF No. 99-1 at 5–15).  Defendants submit that "[u]nder New Jersey law, it is a fundamental proposition that a corporate entity is insulated from liabilities of its related corporate entities."  (Id. at 5) (citing State Dept. of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983)).  They assert that the "purpose of the veil

piercing doctrine is to prevent a corporation from being used to defeat the ends of justice, perpetrate fraud, accomplish a crime, or to otherwise evade the law," and that plaintiff cannot demonstrate such "fraud, injustice, or the like" necessary for the Court to pierce the corporate veil.  (Id.) (citing Lyon v. Barrett, 89 N.J. 294, 300 (1982) and Ventron, 94 N.J. at 500).  Thus, even if plaintiff were able to show complete dominance by the parent corporation over its subsidiary (i.e., the first essential element in a veil-piercing action), defendants maintain that he cannot show a "misuse of the corporate form to perpetrate a fraud or injustice [i.e., the second essential element in a veil-piercing action]."  (Id. at 6) (citing State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC, 646 F. Supp. 2d 668, 679 (D.N.J. 2009)).

Further, defendants argue that Services is a "separately existing corporation from SSLI" and that SSLI has "no involvement in the day to day operations or functions" of Services.  (Id. at 8).  They submit that "Services operates and manages several assisted living facilities, including Brighton Gardens of Edison" and that SSLI "did not provide any day-to-day care or services to [Gimenez-Watson] or any of the residents at [Brighton Gardens]."  (Id. at 9).  Defendants assert that SSLI did not staff, train, or supervise the employees at Brighton Gardens and did not participate in "the development or implementation of policies and procedures for [Brighton Gardens]."  (Id.).  Regarding plaintiff's reliance on the Rush Declaration, defendants characterize Rush as a "disgruntled former CFO of SSLI" who made "unsupported and incorrect conclusory allegations."  (Id.).  They point out that Rush would have no personal knowledge of the facts in this case anyway because he left defendants' employment nearly one year before Gimenez-Watson's alleged choking incident.  (Id. at 9–10).

From a procedural standpoint, moreover, defendants submit that the Rush Declaration

and Nadeau's trial testimony are inadmissible hearsay because they were executed in connection with an unrelated California state court case more than one year before the instant action commenced.  (Id.) (citing Rodriguez v. Duspohl, 1988 U.S. Dist. LEXIS 4502 (D.N.J. May 20, 1988)).  With respect to Nadeau's testimony, defendants claim that plaintiff has "mischaracterized" it by "excerpting and presenting portions of testimony wholly unrelated to the issues before this Court."  (Id. at 11).  They assert that Nadeau does not address facts relevant to jurisdiction or alter ego liability and that he lacks personal knowledge of those issues because, as a former CFO of SSLI, Nadeau was not responsible for matters of corporate formation or structure.  (Id.).  Defendants contend that "it is patently clear from the entirety of plaintiff's application . . . that plaintiff has chosen to provide to the Court only certain, incomplete and misleading portions of hearsay testimony from witnesses, taken completely out of context in a veiled attempt to support his position."  (Id. at 12).

Finally, defendants argue that they cannot be held liable under the participation theory because SSLI is not and has never been an officer of Services.  (Id. at 14) (citing Aff. of Susan Timoner ("Timoner Aff.") ¶ 10, Sept. 27, 2012, ECF No. 99-4).  Defendants point out that plaintiff's sole source for the allegation that SSLI is a corporate officer of Services is the New Jersey Department of Health and Senior Services website; however, defendants maintain that the website's information is erroneous.  (Id. at 14).  They note that neither SSLI nor Services prepared the web pages on which plaintiff relies; rather, defendants direct the Court's attention to the license application of Brighton Gardens, which identifies SSLI as the "parent corporation" of Services and not one of the separately-listed individual officers.  (Id.) (citing Exh. 1 to Timoner Aff., ECF No. 99-4).  Further, defendants submit that even if SSLI were an officer of Services,

there would be no liability under the participation theory because plaintiff filed a negligence action and liability under the participation theory attaches generally in intentional tort cases.  (Id. at 14–15) (citing Saltiel, 170 N.J. at 304–05).  Accordingly, defendants contend that the Court should deny plaintiff's motion for leave to add a participation theory claim because such a claim is "unsupported and unavailing."  (Id. at 14).

###    2.    OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL VARIOUS DISCOVERY RESPONSES

Defendants contend that plaintiff "has failed to make a prima facie showing that the additional requested discovery, geared solely toward an attempt to pierce the corporate veil of the appropriate defendant, Services, is warranted."  (Id. at 4).  First, defendants oppose plaintiff's motion to compel SSLI to serve answers to plaintiff's interrogatories and third request for production of documents because plaintiff "essentially seeks limitless discovery in the hope of finding some basis to maintain his suit against SSLI, a company that played no direct role in the care of services provided to [Gimenez-Watson]."  (Id. at 15).  Defendants argue that plaintiff's interrogatories and document requests are "overly-broad and unduly burdensome" and that Services's responses demonstrate already that SSLI "does not own, operate or manage any assisted living facility, including Brighton Gardens of Edison, and that Services performed all of the day-to-day operations . . . and rendered the care to all of the residents of the facility, including [Gimenez-Watson]."[8]  (Id. at 15–16) (citing Exh. 4 to the Jabbour Certification, ECF No. 99-6).  Thus, defendants maintain that the Court should deny plaintiff's motion to compel discovery

---

[8] Defendants assert that SSLI has in fact responded fully to plaintiff's interrogatories and third request for production of documents.  (Id. at 16–17) (citing Exh. 5 to the Certification of Timothy M. Jabbour, Esq. ("Jabbour Certification"), Sept. 27, 2012, ECF No. 99-7).

because it constitutes a mere "fishing expedition" based on a "hope of finding some basis to maintain some claim against SSLI." (Id. at 16) (citing Eurofins Pharma US Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 157 (3d Cir. 2010)).

Second, defendants argue that Services provided sufficient answers to plaintiff's interrogatories and third request for production of documents. (Id. at 17–23). Defendants address each of Services's answers to plaintiff's interrogatories nos. 1, 5, 6, 7, and 8, and explain why no further response should be required. (Id. at 17–19). With respect to plaintiff's document production requests, defendants maintain that the document demands "far exceed the limitation set forth in the Court's July 12, 2012 Order" and that every individual request "is objectionable on the basis [of being] vague, ambiguous, overly broad and unduly burdensome." (Id. at 19-20). Still, defendants allege that Services nonetheless produced "relevant, non-privileged documents in its possession." (Id. at 20). Defendants address individually plaintiff's document request nos. 1, 5–7, 9, 10–11, 15, 17–19, 23, 25–27, 32, 36, and 41–42, and explain why Services provided sufficient responses to each request. (Id. at 20–23).

Third, defendants oppose plaintiff's motion seeking leave to depose Bradley Rush and designated representatives of SSLI pursuant to Fed. R. Civ. P. 30(b)(6). (Id. at 23–25). Defendants submit that such depositions fall squarely outside the limited discovery permitted by the Court in its July 12, 2012, Order. (Id. at 24) (citing Order, ECF No. 92). They assert that the Court allowed plaintiff to depose two (2) EMT personnel, but made no mention of allowing depositions of Rush or other SSLI representatives. (Id.). Moreover, defendants urge the Court to deny plaintiff's request because any testimony from Rush "is irrelevant both substantively and temporally with respect to the issues in this case[,]" given the fact that he left employment at

16

SSLI and Services in May 2007, almost one year before Gimenez-Watson's alleged choking incident on April 26, 2008.  (Id. at 24–25).

### 3.   DEFENDANTS' CROSS-MOTION FOR PROTECTIVE ORDER

Not only do defendants oppose plaintiff's motion for leave to file a Second Amended Complaint and to compel various discovery responses, but defendants also submit a cross-motion for a protective order pursuant to Fed. R. Civ. P. 26(c).  (Id. at 25–34).

First, defendants argue that the Court should enter a protective order because the additional discovery sought by plaintiff is unreasonably cumulative, burdensome, and plaintiff has had already ample opportunity to obtain such information in this action.  (Id. at 26) (citing Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii)).  Accordingly, defendants contend that the Court must limit the extent of discovery pursuant to Fed. R. Civ. P. 26(b)(2)(C).  (Id.).  Defendants also submit that the Court should issue a protective order forbidding further discovery because they have made a requisite showing of "good cause."  (Id. at 26–27) (citing Fed. R. Civ. P. 26(c)(1)).  That is, defendants claim they have demonstrated that complying with plaintiff's discovery demands would subject them to "annoyance, embarrassment, oppression, or undue burden or expense" because each of plaintiff's requests is "harassing, abusive, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, overly burdensome, or aimed at driving up litigation expenses."  (Id.) (citing Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Caton, 136 F.R.D. 682, 685 (D. Kan. 1991)).  As such, defendants maintain that the Court should not compel them to respond again to plaintiff's interrogatories and document demands, and that the depositions of Bradley Rush and SSLI corporate representatives "should be precluded by the Court and made a subject of the proposed Protective Order."  (Id. at 28).

Second, defendants argue that the Court should enter a protective order pursuant to Fed. R. Civ. P. 26(b)(2)(B) and 26(c) because "good cause exists to protect defendants from the annoyance, embarrassment, oppression and undue burden and expense of the discovery sought by plaintiff."  (Id.).  They assert that plaintiff's document demands "are utterly overbroad and unduly burdensome, requesting any and all documents related to entirely irrelevant subjects." (Id. at 30).  Defendants note that those demands are "based solely upon speculative allegations with respect to piercing the corporate veil" and that "in many instances plaintiff can obtain the requested information from publicly available documents which are [] easily accessible to plaintiff."  (Id.).  Defendants submit the affidavit of Mr. Patrick Horne, the Chief Information Officer for Sunrise Senior Living Management, Inc. ("Management"), to demonstrate that responding to plaintiff's demands "would entail spending hundreds of man hours, and correspondingly, cost[] hundreds of thousands of dollars to complete."  (Id. at 31) (citing Decl. of Patrick Horne ¶¶ 1–3 ("Horne Decl."), Sept. 27, 2012, ECF No. 99-12)).  Horne manages information flow for SSLI and Services, and he declares that defendants lack "the time, equipment, and electronic storage capability to perform the tasks necessary to locate, retrieve, restore, and search the information requested by [p]laintiff in a reasonable time frame."  (Horne Decl. ¶¶ 4, 8, ECF No. 99-12)  He estimates that complying with plaintiff's requests "would greatly exceed $900,000.00 and the time to complete it would take several months."  (Id. ¶ 13). As a result, defendants urge the Court to enter a protective order because plaintiff's document demands are "not reasonably accessible" within Rule 26(b)(2)(B).  (ECF No. 99-1 at 31).

Third, defendants argue that the Court should enter a protective order pursuant to Fed. R. Civ. P. 26(c)(1)(G) because "good cause exists to protect [defendants'] confidential and

proprietary information from disclosure to third parties [and] to prevent irreparable harm to [defendants'] business."  (Id. at 32).  Defendants claim that plaintiff seeks proprietary and confidential business information used "for business planning and strategic decisions concerning the operations of SSLI and Services."  (Id. at 33).  They consider such information "trade secret or confidential in nature because it would cause a significant and irreparable harm to SSLI and Services if it were known to its competitors."  (Id.).  Thus, defendants contend that the proprietary information for which they seek a protective order is "clearly the type of confidential information that [Rule 26(c)(1)(G)] defines and seeks to protect."  (Id.).  Accordingly, defendants submit that they have satisfied their burden under Fed. R. Civ. P. 26(c)(1)(G), and "the confidential and proprietary documents produced to date by [defendants] should be granted protection."  (Id. at 34).

On October 11, 2012, plaintiff filed a reply brief in opposition to defendants' cross-motion for a protective order.  (Pl.'s Reply Br., Oct. 11, 2012, ECF No. 102-8).  Regarding defendants' first point in their cross-motion for a protective order, plaintiff reiterates his position that defendants' responses are deficient and that plaintiff's discovery demands are "consistent with what the case law requires us to show to pierce the corporate veil."  (Id. at 4).  Regarding defendants' second point, plaintiff offers to "limit his request for electronic information to the months of April and May 2008, which are the months of the choking incidents at defendants' facility that caused the death of plaintiff's decedent that is at issue in this lawsuit."  (Id. at 6).  Regarding defendant's third point, plaintiff argues that "that aspect of [defendants'] motion is patently deficient and must be denied" because defendants "have utterly failed to comply with Local Civil Rule 5.3."  (Id. at 7).

**IV.   DISCUSSION**

    **A.   Standard – Motion for Leave to File Second Amended Complaint**

"The threshold issue in resolving a motion to amend is the determination of whether the motion is governed by Rule 15 or Rule 16 of the Federal Rules of Civil Procedure." Karlo v. Pittsburgh Glass Works, LLC, No. 10-1283 (NBF), 2011 WL 5170445, at *2 (W.D. Pa. Oct. 31, 2011).  Rule 15 states, in pertinent part, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  "Rule 16, on the other hand, requires a party to demonstrate 'good cause' prior to the Court amending its scheduling order." Karlo, 2011 WL 5170445, at *2 (citing Fed. R. Civ. P. 16(b)(4)).  There is "tension" between the standards of the two Rules, which the Third Circuit Court of Appeals has not resolved directly. Id. at *2 n.3 (citing Assadourian v. Harb, 430 Fed. App'x 79 (3d Cir. 2011)).  However, Third Circuit courts "have consistently reached the same conclusion:  a party seeking to amend the pleadings *after the deadline set by the Court* must satisfy the requirements of Rule 16(b)(4) – i.e., they must show 'good cause.'" Id. (citations omitted).  Therefore, if a party has filed a motion to amend "after the deadline set by the Court, the movant must satisfy the [good cause standard] of Rule 16 before the Court will turn to Rule 15." Id. at *2.  Here, on August 13, 2012, the Court extended the deadline for plaintiff to file a motion to amend the complaint until September 13, 2012. (Consent Order ¶ 2, ECF No. 96).  Because Watson filed his motion for leave to file a Second Amended Complaint on September 13, 2012 (ECF No. 97), his motion to amend is governed by the more liberal Rule 15 standard, rather than the Rule 16(b) "good cause" standard.

    Under Rule 15, a plaintiff may amend his complaint once as of right; "courts may grant

subsequent amendments 'when justice so requires.'"   Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 116 (3d Cir. 2003) (quoting Fed. R. Civ. P. 15(a)).   The Court may deny leave to amend the pleadings only where there is (1) undue delay, (2) bad faith or dilatory motive, (3) undue prejudice, (4) repeated failures to cure deficiencies, or (5) futility of amendment.   Foman v. Davis, 371 U.S. 178, 182 (1962); Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) ("We have held that motions to amend pleadings [under Rule 15(a)] should be liberally granted.") (citations omitted); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("Under Rule 15(a), if a plaintiff requests leave to amend a complaint . . . such leave must be granted in the absence of undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment.").   Here, defendants allege that the Court should deny plaintiff's motion for leave to file a Second Amended Complaint because of the futility of the amendment; that is, defendants argue that plaintiff has not stated a prima facie claim for either the alter ego theory of liability (Proposed Sixth Count) or liability under the participation theory (Proposed Seventh Count). (ECF No. 99-1 at 5–15); Hill v. City of Scranton, 411 F.3d 118, 134 (3d Cir. 2005) (establishing that "it would have been futile to allow [plaintiff] to amend his complaint because his allegations before the District Court did not state a claim on which he could have obtained relief").   Because defendants do not argue that there is undue delay, bad faith on the part of plaintiff, undue prejudice, or that plaintiff has failed repeatedly to cure deficiencies, the Court bases its determination on whether to grant plaintiff's motion to amend solely on whether it would be "futile" to allow plaintiff's proposed new counts to proceed.   See Assadourian v. Harb, No. 06-896 (JAG), 2008 WL 4056361, at *3 ("The futility of amendment, or the failure of the plaintiff to articulate a claim, may also serve as a basis for denying a motion to amend.").

21

A court will consider an amendment futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face." Harrison Beverage Co. v. Dribeck Imps., Inc., 133 F.R.D. 463, 468 (D.N.J. 1990) (citations omitted) (internal quotations marks omitted).  To determine whether an amendment is insufficient on its face, the Court employs the standard applied to Rule 12(b)(6) motions to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  Under this standard, the question before the Court is not whether the movant will ultimately prevail, but whether the complaint sets forth "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (establishing that a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"); Harrison Beverage, 133 F.R.D. at 468 ("'Futility' of amendment is shown when the claim or defense is not accompanied by a showing of plausibility sufficient to present a triable issue.").  A two-part analysis determines whether this standard is met.  Fowler, 578 F.3d at 210 (citing Ashcroft v. Iqbal, 556 U.S. 662, 629 (2009)).

First, a court separates the factual and legal elements of a claim.  Fowler, 578 F.3d at 210. All well-pleaded facts set forth in the pleading and the contents of the documents incorporated therein must be accepted as true, but the Court may disregard legal conclusions.  Id. at 210–11; West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 97 n.6 (3rd Cir. 2010); see also Iqbal, 556 U.S. at 678 (noting that a complaint is insufficient if it offers "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions" devoid of "further factual enhancement") (alterations omitted) (internal quotations marks omitted).

Second, as stated above, a court determines whether the plaintiff's facts are sufficient "to

state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570; <u>accord</u> <u>Fowler</u>, 578 F.3d at 211.  As the Supreme Court instructed in <u>Iqbal</u>, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  556 U.S. at 678.  The plausibility standard is not a "probability requirement," but the well-pleaded facts must do more than demonstrate that the conduct is "merely consistent" with liability so as to "permit the court to infer more than the mere possibility of misconduct."  <u>Id.</u> at 678–79 (citations omitted) (internal quotation marks omitted).  This "context-specific task . . . requires the reviewing court to draw on its judicial experience and common sense."  <u>Id.</u> at 679.

Further, a court may consider only a limited record when evaluating whether a proposed amendment is futile.  Specifically, a court may consider only the proposed pleading, exhibits attached to that pleading, matters of public record, and undisputedly authentic documents provided the claims are based on those documents.  <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993); <u>accord</u> <u>West Penn</u>, 627 F.3d at 97 n.6 (reiterating the rule and its limited exception for documents that are "integral or explicitly relied upon in the complaint").  Accordingly, the Court will consider only plaintiff's proposed Second Amended Complaint (ECF No. 97-3), the declaration of Thomas Howard (ECF No. 97-2), and the corresponding exhibits and documents that Howard incorporates explicitly by reference and relies upon in support of plaintiff's motion to amend.

### B.    Alter Ego Claim

Count Six of the proposed Second Amended Complaint alleges that SSLI "dominates and controls Services, to the extent that Services is merely a sham corporation" and that SSLI is the

"alter ego" of Services.  (Proposed Second Am. Compl., ECF No. 97-3 at 21–23).  As such, plaintiff seeks to "pierce the corporate veil" in his Proposed Sixth Count and hold SSLI liable for the alleged negligence and medical malpractice of Services.  (Id.).

With respect to piercing the corporate veil, it is "deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." Portfolio Fin. Servicing Co. v. Sharemax.com, Inc., 334 F. Supp. 2d 620, 626 (D.N.J. 2004) (citations omitted) (internal quotations marks omitted); see Pappas, 646 F. Supp. 2d at 678–79 (stating the "fundamental proposition[] that a corporation is a separate entity from its shareholders and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise") (internal citations omitted).  However, while "[l]iability will not be imposed on the parent corporation merely because of its ownership of the subsidiary[,] . . . under both state and federal common law, abuse of the corporate form will allow courts to employ the 'tool of equity' known as veil-piercing." Portfolio, 334 F. Supp. 2d at 626 (citations omitted); see Pappas, 646 F. Supp. 2d at 679 ("[P]iercing the corporate veil is not a mechanism by which legal liability is imposed per se, but rather an equitable remedy designed to remedy a fundamental unfairness perpetrated under the guise of the corporate form.").  A court will "pierce the corporate veil" only "[w]here the parent-subsidiary relationship appears to be a facade created merely to perpetrate a fraud or evade the law." Portfolio, 334 F. Supp. 2d at 626 (citing United States v. Bestfoods, 524 U.S. 51, 62–63 (1988)).

Under New Jersey law, a court may pierce the corporate veil only if two elements are

present: (1) that a parent corporation dominated its subsidiary[9] to the extent that the subsidiary "had no separate existence but was merely a conduit for the parent" and (2) that the parent corporation "abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Ventron, 94 N.J. at 500 (citations omitted); Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 198 (App. Div. 2006).  To ascertain whether the first element is satisfied, courts within the Third Circuit consider a variety of factors, including "gross undercapitalization, failure to observe corporate formalities, non-payment of dividends, [], siphoning of funds of the corporation by the dominant stockholder, non-function of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder." Mall at IV Group Props., LLC v. Roberts, No. 02-4692 (WHW), 2005 U.S. Dist. LEXIS 31860, at *9 (D.N.J. 2005); Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988).  To determine whether the second element is present, courts within the Third Circuit inquire as to whether the parent corporation "via the corporate form, perpetrated 'a fraud, injustice, or the like.'" Pappas, 646 F. Supp. 2d at 679 (citing Group Props., 2005 U.S. Dist. LEXIS 31860, at *9); Portfolio, 334 F. Supp. 2d at 626 ("In the Third Circuit, courts have held veil-piercing to be appropriate when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime, or when the parent so dominated the subsidiary that [the subsidiary] had no separate existence.") (citations omitted) (internal quotations marks omitted).

---

[9] Courts generally pierce the corporate veil of a subsidiary to reach the assets of the controlling parent corporation.  However, "the doctrine can also be applied in reverse to reach the assets of the subsidiary." Portfolio, 334 F. Supp. 2d at 626 (citations omitted).

Here, plaintiff has stated a prima facie claim of alter ego liability because he has made a plausible showing as to both requirements for piercing the corporate veil.  First, plaintiff has pled facts showing that it is plausible that SSLI dominated Services to the extent that Services was rendered a mere conduit for SSLI.[10]  Relying on the October 16, 2007, Rush Declaration (ECF No. 87-3) and Nadeau's May 14, 2008, trial testimony (ECF No. 87-4), plaintiff alleges in the proposed Second Amended Complaint that SSLI "dominates and controls Services, to the extent that Services is merely a sham corporation."  (ECF No. 97-3 at 21).  Plaintiff alleges that SSLI dominates Services because Services maintains no financial books or corporate records of its own and its profits "are swept into an account controlled by another subsidiary from which [SSLI] withdraws amounts whenever and for whatever purposes it deems necessary in its sole discretion."  (Id.).  Plaintiff alleges in the proposed Second Amended Complaint that SSLI and Services failed to observe corporate formalities; for example, he alleges that SSLI controlled Services's budget and that Services had no bank accounts, capital, or business purpose of its own.[11]  (Id. at 22–23).  Taken together, those well-pleaded facts, which the Court must accept as

---

[10] For limited purposes of this analysis under Fed. R. Civ. P. 15, the Court must accept as true all well-pleaded facts set forth in plaintiff's proposed Second Amended Complaint.  Fowler, 578 F.3d at 210–11.

[11] Plaintiff relies on, and the Court considers, the Rush Declaration and Nadeau's trial testimony solely to demonstrate a good-faith basis for the proposed claims – i.e., that the allegations rise above a mere suspicion.  Twombly, 550 U.S. at 555.  In engaging in the Rule 15 analysis, this Court does not assess the factual merits of plaintiff's claims or the evidentiary support for those claims.  Defendants will have a full opportunity to challenge the factual merits of plaintiff's allegations during dispositive motion practice.  In terms of whether plaintiff has a good-faith basis for the allegations set forth in proposed Counts Six and Seven, the declaration and testimony suggest that SSLI, as the parent corporation, wholly controlled Services's finances and siphoned its funds "in whatever amounts it chose . . . as it saw fit."  (See ECF No. 87-3 ¶¶ 5, 9–10, 14; ECF No. 87-4).  In particular, Nadeau's testimony indicates that SSLI and Services do

(continued...)

true, indicate that it is plausible that SSLI dominated Services so that Services had no separate corporate existence for purposes of veil-piercing analysis. See generally Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) ("[A] court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiffs.").

Second, plaintiff has pled facts showing that it is at least plausible that SSLI "abused the privilege of incorporation" by using Services "to perpetrate a fraud or injustice, or otherwise to circumvent the law." Ventron, 94 N.J. at 500 (citations omitted). Plaintiff alleges that Services exists solely to shield SSLI from liability for wrongful death lawsuits (ECF No. 97-1 at 6), and he provides well-pleaded facts in support of that allegation. (See ECF No. 97-3 at 21–23). Specifically, plaintiff alleges in the proposed Second Amended Complaint that Services "is merely a sham corporation" to shield SSLI from liability for wrongful death and injury claims. (Id. at 21). He alleges that SSLI decides how to balance funds between it and Services, and withdraws profits from Services in its sole discretion.[12]  (Id. at 21–23). Further, plaintiff alleges

---

[11](...continued)
not maintain separate financial records; rather, the funds made by SSLI and its subsidiaries are funneled into "one central depository" that is controlled solely by SSLI. (ECF No. 87-4). Nadeau testified that SSLI determines how to spend the money generated by its subsidiaries without regard to its subsidiaries' independent corporate priorities. (Id.). In addition, Rush declared that even after he became President of Services, the "overwhelming bulk" of his responsibilities were performed on behalf of SSLI and the only duty he performed for Services was "simply to sign license applications." (ECF No. 87-3 ¶ 6). Rush's disparity of corporate duties as between the parent corporation (SSLI) and its subsidiary (Services) provides a good faith basis for plaintiff to allege that SSLI dominated Services to the extent that Services was a mere conduit for SSLI.

[12] Plaintiff again relies on the Rush Declaration and Nadeau's trial testimony, both of which aver that Services did not maintain a corporate existence independent from SSLI. (See ECF Nos. 87-3 and 87-4). Rush, in particular, declared that Services "functioned as little more than an applicant for, and as a name to place on, an assisted living facility [] license." (ECF No.

(continued...)

that SSLI "sets and controls Brighton Gardens' budgets and revenues, including salaries of all management personnel, which budgets and revenues directly affected the quality of the care provided to [Gimenez-Watson]."  (Id. at 22).  He asserts that SSLI "controls all bank accounts and pays all bills of Brighton Gardens, which does not have any bank accounts that are used for business operations in its own name or in the name of Services."  (Id.).

Moreover, plaintiff alleges in the proposed Second Amended Complaint that Services "had no bank accounts or other property of its own[,] . . . had no capital of its own[,] . . . [and] had no business or business purpose of its own."  (Id. at 23).  As a result, plaintiff alleges that SSLI "exercised such control over Services that it constitutes its alter ego."  (Id.).  Taken together, those allegations, which the Court must accept as true, indicate that it is entirely plausible that SSLI deliberately keeps Services undercapitalized so as to circumvent the law or commit a form of manifest injustice.[13]  Because the Court must assume "that all the allegations in

---

[12](...continued)
87-3 ¶ 8).  He asserted that SSLI would balance funds between it and Services based only on SSLI's priorities and that the two companies did not function independently.  (Id. ¶¶ 9, 14). Nadeau, similarly, testified that the funds generated by Services "belong[ed] to" SSLI.  (ECF No. 87-4).

[13] At oral argument, defendants contended that plaintiff cannot make a prima facie showing of "manifest injustice" sufficient to allow his new claim on piercing the corporate veil to proceed because SSLI holds insurance policies in excess of $10 million.  Such policies, defendants maintained, would pay plaintiff any potential recovery, and therefore alleviate any "manifest injustice."  Plaintiff argued that he seeks, among other forms of relief, punitive damages, which insurance generally does not cover.  He also pointed out that defendants had failed to produce copies of the alleged insurance policies.

The Court here is no position to assess whether SSLI holds insurance policies, the extent of coverage they would provide, and whether their purported existence would preclude plaintiff from making a showing of "manifest injustice," because defendants have not placed copies of those insurance policies before the Court.  Further, at oral argument, defendants were not clear as

(continued...)

the complaint are true (even if doubtful in fact)," the Court finds that plaintiff's allegation – that SSLI used Services to "circumvent the law" – rises above a mere suspicion.  Twombly, 550 U.S. at 555; see generally Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (stating that "leave to amend must generally be granted unless equitable considerations render it otherwise unjust").  Thus, plaintiff has provided enough facts, which, taken as true, "raise a reasonable expectation that discovery will reveal evidence of the necessary element [i.e., SSLI's use of the privilege of incorporation to circumvent the law]."  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (citation omitted) (internal quotations marks omitted).

 Defendants contend that plaintiff cannot rely on the Rush Declaration and Nadeau's trial testimony to establish a good faith basis to make those allegations because that testimony was advanced in Adams, a wholly unrelated California state court case, rendering them inadmissible hearsay.  (ECF No. 99-1 at 10–11).  However, plaintiff is not introducing those documents into evidence.  Rather, he relies on them to demonstrate a good-faith basis to amend the Complaint to plead the Sixth Count, and to seek additional discovery.[14]

Defendants fail to provide any authority for the proposition that plaintiff cannot rely on hearsay evidence for purposes of amending a complaint, particularly given the liberal standard under Rule 15, and the Court similarly finds no such prohibition.  See Twombly, 550 U.S. at 555;

---

[13](...continued)
to which corporation in fact held the alleged insurance policies: SSLI, Services, or Management.  Moreover, while it may be true that SSLI holds insurance policies in excess of $10 million, that does not alter the Court's conclusions that (1) plaintiff, for limited purposes of this Rule 15 analysis, has set forth well-pleaded allegations to support his proposed new claim on piercing the corporate veil and (2) plaintiff has a good faith basis for making these allegations.

[14] Indeed, part of the discovery that plaintiff seeks is to depose Rush.  (See ECF No. 97-1 at 9–10).

Arthur, 434 F.3d at 204.  Defendants cite to Dusphol, but that case does not control.  In Dusphol,

the court denied plaintiff's motion for reconsideration, determining that the certifications

submitted by plaintiff in support of his motion were not "competent evidence" because they were

not within the personal knowledge of the certifier.  1988 U.S. Dist. LEXIS 4502, at *4.  Here, in

contrast, plaintiff does not submit the Rush Declaration or Nadeau's testimony into evidence, nor

does he rely on them to establish personal jurisdiction.  Because he relies on them only in the

context of showing good cause under Rule 15 to add new claims in his proposed Second

Amended Complaint, the hearsay rule does not bar plaintiff's reliance on those documents.  See

Fed. R. Evid. 801(c).

Defendants also argue that Rush lacks personal knowledge of whether SSLI abused the

corporate form because his employment for defendants ended on May 2, 2007, and Gimenez-

Watson's alleged choking incident occurred on April 26, 2008.  (See ECF No. 99-1 at 9–10).

That criticism, well-grounded or not, attacks the credibility of Rush's Declaration, but it does not

preclude plaintiff from relying on the Rush Declaration to demonstrate good cause to add new

claims.  It also fails to explain why plaintiff should not be allowed the opportunity to depose

Rush to determine whether Rush has personal knowledge of the statements set forth in his

affidavit, or whether other sources may provide that information.

In sum, plaintiff's proposed Sixth Count seeking to pierce the corporate veil is not futile

because he has pled facts sufficient to state a plausible claim to relief with respect to both

elements necessary for imposing alter ego liability.  Accordingly, the Court will grant plaintiff's

motion to amend to add the Sixth Count.

C.      **Participation Theory Claim**

Count Seven of the proposed Second Amended Complaint alleges that SSLI "participated in the mistreatment, lack of care, neglect and other acts and omissions that caused" Gimenez-Watson's injury, and ultimately, her death.  (ECF No. 97-3 at 23).  Plaintiff contends that SSLI constitutes the "governing authority" of Brighton Gardens as that term is used in N.J.A.C. 8:36-5.2(c), and it should therefore be held liable under the participation theory.  (Id.).

"[T]he essence of the participation theory is that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort.  A predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct."  Saltiel, 170 N.J. at 303.  New Jersey courts have generally used the participation theory to impose liability on corporate officers for their tortious conduct in cases involving intentional torts, such as fraud or conversion.  Id. at 304 (citations omitted).  The genesis of the participation theory was that "an officer should not be permitted to escape the consequences of his individual wrongdoing by saying that he acted on behalf of a corporation in which he was interested."  Id. (quoting Hirsch v. Phily, 4 N.J. 408, 416 (1950)).

Here, plaintiff's proposed Seventh Count is futile because he fails to plead facts sufficient to state a plausible claim to relief.  Even assuming that SSLI were a "corporate officer" of Brighton Gardens or Services,[15] plaintiff still fails to plead facts demonstrating that SSLI was

---

[15] Plaintiff incorporates by reference copies of web pages from the New Jersey Department of Health and Senior Services website, which indicate that SSLI is a corporate officer of Brighton Gardens.  (ECF No. 87-5).  Defendants, however, argue that neither SSLI nor Brighton Gardens prepared those pages, and instead directs the Court's attention to the license

(continued...)

"sufficiently involved" in the commission of the alleged torts.  For the proposition that SSLI was

"sufficiently involved" in the alleged negligence and medical malpractice, plaintiff cites to the

New Jersey Administrative Code, which states "[t]he owner or governing authority of [an

assisted living facility] shall assume legal responsibility for the management, operation, and

financial viability of the facility or program."  N.J.A.C. 8:36-5.2(c).  While SSLI is the

"governing authority" of Brighton Gardens, that general code provision does not confer vicarious

liability on a parent corporation for the negligence or tortious conduct of its subsidiary.  See

Pappas, 646 F. Supp. 2d at 679 (reiterating the notion that, absent extraordinary circumstances, a

parent corporation will not be held liable for the acts of its subsidiary).

In addition, plaintiff submits that SSLI promulgated the "Choking or Blocked Airway"

protocol for employees of Services to follow when dealing with a choking incident.  (ECF No.

87-9).  That protocol set forth an eight-step process for employees to comply with when a

resident chokes or experiences a blocked airway.  (Id.).  Even if SSLI promulgated the protocol,

the fact that SSLI did so demonstrates that it took tangible action to ensure that Services abided

by the law; it does not show that SSLI was "sufficiently involved" in the commission of the

alleged torts.  Even if some employees of Services failed to follow the "Choking or Blocked

Airway" protocol, such negligence or professional malpractice on their part does not render SSLI

liable under the participation theory because the "sufficient involvement" element is still lacking.

Finally, plaintiff does not claim that an intentional tort occurred here, which is generally

---

[15](...continued)
application of Brighton Gardens, which identifies SSLI as its "parent corporation."  (Exh. 1 to
Timoner Aff., ECF No. 99-4).  That application, which Brighton Gardens prepared, also lists the
individual officers and directors of Services, and does not include SSLI.  (Id.).

the context in which courts impose liability on corporate officers under the participation theory. See Saltiel, 170 N.J. at 304.  He does not even plead facts demonstrating that this case constitutes a rare instance in which liability under the participation theory should be imposed absent the commission of an intentional tort, nor caselaw supporting a participation theory in a factual circumstances analogous to those plead in the Complaint.  Thus, because plaintiff has failed to provide facts showing that SSLI was "sufficiently involved" in the alleged negligence or medical malpractice, or a sound basis to apply the participation theory to negligence claims, he has failed to state a prima facie claim for SSLI's liability under the participation theory.  As a result, the Court denies plaintiff's motion to amend to add the Seventh Count on futility grounds.

### D.    Plaintiff's Motion to Compel Various Discovery Responses

In addition to his motion for leave to file a Second Amended Complaint, plaintiff seeks to compel the following discovery responses: (1) answers from SSLI to plaintiff's interrogatories and third request for documents; (2) more complete responses from Services to plaintiff's interrogatories and third request for documents; and (3) that the Court allow plaintiff to depose Bradley B. Rush and designated representatives of SSLI pursuant to plaintiff's Fed. R. Civ. P. 30(b)(6) notice.  (ECF No. 97-1 at 8–10).

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Because the purpose of discovery is to uncover facts about the claims and defenses set forth in the pleadings, the boundaries of relevance under Rule 26 depend on the context of each action. See Salamone v. Carter's Retail, Inc., Civ. No. 09-5856, 2011 WL 1458063, at *2 (D.N.J. Apr. 14, 2011) (Brown, C.J.); accord Hickman v. Taylor, 329 U.S. 495, 507 (1947).  Generally,

though, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  Evidence that is not relevant is not admissible. Fed. R. Evid. 402.  The relevancy standard is often construed broadly and the determination of relevance is ultimately within the court's discretion.  Salamone, 2011 WL 1458063, at *2 (citations omitted).  As it relates to a request for jurisdictional discovery, courts within the Third Circuit have concluded that "such a request may be denied if the plaintiff's claim is 'clearly frivolous' or constitutes a mere 'fishing expedition.'"  Dicuio v. Brother Int'l Corp., No. 11-1447 (FLW), 2011 U.S. Dist. LEXIS 131553, at *18 (D.N.J. Nov. 15, 2011).

Here, the Court has reviewed the responses provided by both SSLI (ECF No. 99-7) and Services (ECF Nos. 97-6 and 97-7) to plaintiff's interrogatories and third request for production of documents.  For the reasons articulated in this Opinion, plaintiff has set forth a plausible claim on piercing the corporate veil; consequently, discovery on this issue is relevant.  As such, the Court grants plaintiff's motion to compel various discovery responses to the extent that plaintiff seeks information relevant to the issue of alter ego liability, subject to the following limitations. Because plaintiff served his interrogatories pursuant to Fed. R. Civ. P. 33 (see ECF No. 97-5), rather than Local Civil Rule 33.1(b), defendants, in their answers to plaintiff's interrogatories, are not required "for each answer not verified by personal knowledge . . . [to] identify the person or persons from whom the information was obtained."[16]  L. Civ. R. 33.1(b).  Had plaintiff sought

_____

[16] "L. Civ. R. 33.1(b) requires the identification of the sources, either individuals or documents, for all information set forth in answers to interrogatories." Cmt. 3 to L. Civ. R. 33.1. Therefore, for any answer "not verified on the personal knowledge of the individual signing the answers," L. Civ. R. 33.1 requires the "identity of the person or persons from whom the

(continued...)

the information specific to L. Civ. R. 33.1(b), he should have so specified before defendants' answers were due.  See L. Civ. R. 33.1(b), Cmt. 3 (2013 ed.) ("Because L. Civ. R. 33.1(b) requires more specificity than does Fed. R. Civ. P. 33, the best course when serving interrogatories is to state explicitly that they are promulgated pursuant to both Fed. R. Civ. P. 33 and L. Civ. R. 33.1(b).  The express reference to the local rule puts the adversary party on notice that the serving party will insist on compliance with the additional requirements of L. Civ. R. 33.1(b).").

With respect to the forty-three (43) outstanding document requests, the parties must meet and confer pursuant to Fed. R. Civ. P. 37(a)(1) and L. Civ. R. 37.1(a)(1) in a good faith attempt to resolve their disputes, now that they have the benefit of the Court's ruling on plaintiff's motion to amend the complaint.  The Court has provided already the appropriate protocol for the parties to follow when confronted with a discovery dispute.[17]  If the parties cannot resolve their

---

[16](...continued)
information in that answer was obtained."  Id.  In contrast, Fed. R. Civ. P. 33 "merely requires generally that answers be signed by the person making them."  Id.  Plaintiff here served his interrogatories pursuant to Fed. R. Civ. P. 33.  As a result, defendants are not required to disclose the sources of their answers, as they would be so required if plaintiff served his interrogatories pursuant to L. Civ. R. 33.1.

[17] Paragraph nine (9) of the Pretrial Scheduling Order provides:

"No discovery motion . . . shall be made without prior leave of Court.  Counsel shall confer in good faith and attempt to informally resolve any discovery disputes before seeking the Court's intervention.  Should such informal efforts fail, the aggrieved party shall bring the dispute to the Court's attention in the first instance by a brief letter, not to exceed 5 pages, outlining the dispute.  The other party will then be permitted to submit a brief opposition letter, not to exceed 5 pages.  Thereafter, the Court will schedule a telephonic discovery conference pursuant to Fed. R. Civ. P. 26(f) to resolve the dispute.  See L. Civ. R. 16.1(f)."

Pretr. Sched. Order ¶ 9, Mar. 22, 2010, ECF No. 22.  Here, the Court finds that the parties
(continued...)

issues relating to plaintiff's document requests, they must abide by the protocol outlined in paragraph nine (9) of the March 22, 2010, Pretrial Scheduling Order.

Further, to the extent plaintiff seeks electronically stored information (ESI), such discovery is limited to "electronic information [in] the months of April and May 2008."  (See Pl.'s Reply Br., ECF No. 102-8 at 6 and Horne Decl. ¶¶ 1–3, 4, 8, 13, ECF No. 99-12) (describing the practical and financial difficulties associated with plaintiff's vast electronic discovery requests).  The Court leaves it to the parties, in the first instance, to determine which specific document requests encompass ESI, as the parties fail to identify with specificity the document requests that allegedly seek production of ESI.

Finally, the Court grants plaintiff's request to depose Bradley Rush and to conduct a Rule 30(b)(6) deposition of a designated SSLI representative.  Defendants argue that allowing additional depositions would contravene the Court's July 12, 2012, Order.  See Order, ECF No. 92.  The Court disagrees with defendants' interpretation of the July 12, 2012, Order.  Moreover, pursuant to the Court's authority to manage the conduct of litigation proceedings, including discovery, pursuant to Fed. R. Civ. P. 16, and given the Court's ruling on plaintiff's motion to amend the complaint, the Court finds there is good cause to allow plaintiff to conduct the limited depositions sought here.  However, for the same reasons, those depositions shall be limited to questions regarding the alter ego theory of liability.

---

[17](...continued)
have not met and conferred adequately because they have failed to comply with the Court's plain instruction to submit a joint letter on the outstanding document request issues.  In fact, the separate motion papers do not indicate that the parties met at all or conferred meaningfully in an effort to resolve their discovery issues.

### E.      Defendants' Cross-Motion for a Protective Order

In addition to opposing plaintiff's motion for leave to file a Second Amended Complaint and to compel various discovery responses, defendants submit a cross-motion for a protective order to limit the discovery sought by plaintiff and to protect alleged confidential and proprietary documents produced already by defendants.  (ECF No. 99-1 at 25–34).

Federal Rule of Civil Procedure 26(b)(2)(C) states that "the court must limit the frequency or extent of discovery otherwise allowed by [the Federal Rules of Civil Procedure] or by local rule" in three instances: (i) where the discovery sought is "unreasonably cumulative or duplicative"; (ii) where the party seeking discovery has had already "ample opportunity" to obtain such discovery; and (iii) where the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case . . . the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii).

For the reasons expressed throughout this Opinion, the Court finds that the information sought by plaintiff on piercing the corporate veil, as limited by this Opinion, is relevant and not "unreasonably cumulative," given the need for discovery on the alter ego theory of liability. Therefore, the Court denies without prejudice defendants' cross-motion to the extent that it seeks to preclude plaintiff from taking the Rush and Rule 30(b)(6) depositions.

The Court also denies defendants' cross-motion for a protective order to the extent that it seeks to protect alleged confidential and proprietary documents produced already in discovery. (See ECF No. 99-1 at 32–34).  Defendants have failed to identify the specific documents that contain alleged confidential and proprietary information warranting protection.  The Court denies

this aspect of defendants' cross-motion without prejudice to the right of defendants to seal documents that they assert are confidential or proprietary.  Any such motion to seal must comply with Local Civil Rule 5.3(c), and any party seeking an order sealing or otherwise restricting public access to Court proceedings or materials filed with the Court must file a motion that describes with sufficient detail and particularity:

> (a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available.

L. Civ. R. 5.3(c)(2).

## IV.    CONCLUSION

For the reasons stated herein, plaintiff's motion for leave to file the proposed Second Amended Complaint is granted to allow plaintiff to add his proposed Sixth Count on alter ego liability and denied to preclude plaintiff from adding his proposed Seventh Count on the participation theory.  Plaintiff's motion to compel various discovery responses is granted in part, and defendants' cross-motion for a protective order is denied.  The Court will issue an order consistent with this Opinion.

s/Michael A. Hammer
**UNITED STATES MAGISTRATE JUDGE**

Date: January 8, 2013

38