## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DAVID WATSON, individually and as Executor of the ESTATE OF NANCY CLARE GIMENEZ-WATSON,**<br><br>                              **Plaintiffs,**<br><br>v.<br><br>**SUNRISE SENIOR LIVING FACILITY, INC. d/b/a BRIGHTON GARDENS OF EDISON, BRIGHTON GARDENS OF EDISON, SUNRISE SENIOR LIVING, INC., JANE DOE NURSES 1-50, JANE DOE NURSES TECHNICIANS, CNA'S AND PARAMEDICAL EMPLOYEES 1-50, ABC CORPORATION, ABC PARTNERSHIP, and XYZ CORPORATION (these names being fictitious as their true names are unknown),**<br><br>                              **Defendants.** | Civ. No. 10-cv-230 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This is a personal injury action brought by David Watson ("Mr. Watson") individually and on behalf of the estate of his mother, Nancy Gimenez-Watson ("Mrs. Watson"). Mrs. Watson was a patient-resident at Brighton Gardens of Edison ("Brighton Gardens"), a New Jersey assisted living facility. On April 26, 2008, she died after choking on food that was served to her at Brighton Gardens. Mr. Watson alleges that his mother's death was caused by negligence and mistreatment by Brighton Gardens' operator, Sunrise Senior Living Services, Inc. ("Services"), and its parent company, Sunrise Senior Living, Inc. ("SSLI"). Now before the Court is the defendants' motion for summary

judgment.[1] For the reasons set forth below, the motion is granted in part and denied in part.

## I.    BACKGROUND

Brighton Gardens is an assisted living facility and nursing home in Edison, New Jersey. Brighton Gardens is licensed and operated by Services, a Delaware corporation. Services is a wholly owned subsidiary of SSLI, a Delaware corporation with its principal place of business in McLean, Virginia.

On March 25, 2006, Mrs. Watson, who suffered from Alzheimer's disease and dementia, entered Brighton Gardens as a "resident."[2] (Defs. L. R. 56.1 Statement of Undisputed Material Facts ("Def. Facts"), Dkt. No. 158-1, ¶¶18-19) All residents of the assisted living facility receive certain "base services," such as "reminders and supervision" with regard to "eating, bathing, dressing, grooming, toileting, ambulating, and orientation." (Residency Agreement, Ex. E, Cert. of Tim M. Jabbour ("Jabbour Cert."), Dkt. No. 158-8, at 5) They are also given three meals per day in the facility's dining room. (*Id.* at 6) Mrs. Watson was placed in the facility's "Assisted Living Plus" program, which meant that she "require[d] or prefer[red] more frequent and intensive assistance with activities of daily living" than were provided at the basic level of care. (*Id.* at 19) In May 2006, Mrs. Watson was moved to the "Reminiscence Plus" program (Def. Facts ¶21), which provides a greater level of care specifically designed for residents "who have a diagnosis ...of Alzheimer's disease or related disorder such as dementia." (Residency Agreement, at 7)

---

[1]    "Defendants," as used in this Opinion, refers collectively to Services and SLLI, the movants.

[2]    A "resident" is "any individual receiving extended medical or nursing treatment or care at a nursing home." N.J.S.A. 30:13-2(e); *see also* N.J.A.C. 8:39-1.2 (defining "resident" as "a person who resides in [a long-term care] facility and is in need of 24-hour continuous nursing supervision).

<u>Brighton Gardens' Medical Assessment Policies</u>

The policy of Brighton Gardens is to assess any changes in a resident's medical condition to determine whether the level of care given to that resident is adequate. Changes are reported to the resident's attending physician, who can order Brighton Gardens to implement an appropriate medical response. In addition, Brighton Gardens' nurses are required to create an "Incident Report" whenever a resident experiences one or more predefined "incidents," including "[c]hoking which requires emergency actions" and "[f]alls with injury." (Incident Reporting, Ex. 22, Decl. of Thomas S. Howard ("Howard Decl."), Dkt. No. 167-22, at 3) The nurse who witnessed the incident must complete the Incident Report "as soon as possible...but no later than the end of their shift." (*Id.* at 2) The nurse must also make an entry regarding the incident in the resident's Progress Notes—a daily record compiled for each resident. (*Id.*) Finally, the resident's attending physician must be notified of the incident within 12 hours. (*Id.* at 4)

Brighton Gardens also has a specific protocol for treating a resident who suffers choking or a blocked airway. The protocol instructs the staff members to "Call 911"; "Clear the resident's airway immediately if the resident is not able to talk or cough by performing the emergency procedure for choking"; "document[] the incident in the resident's Progress Notes"; and "Complete an incident report." (Choking or Blocked Airway, Ex. 25, Howard Decl., Dkt. No. 167-27, at 2)

<u>Mrs. Watson's Decline in Health</u>

The issue in this case is whether Brighton Gardens adequately responded to the apparent deterioration in Mrs. Watson's health. The parties agree that when Mrs. Watson first came to Brighton Gardens, she was able to walk and dine independently. (Def. Facts ¶22). According to Mr. Watson,

however, Mrs. Watson thereafter experienced significant changes in her medical condition which the defendants, in violation of their own policies and the prevailing standard of care, failed to recognize and address.

Mrs. Watson reportedly sustained falls on six occasions in early 2008. Two of those falls, both on April 1, 2008, resulted in injury. Although an Incident Report was filed, Brighton Gardens allegedly waited until April 12, 2008, to update her medical records. (Second Am. Compl., Dkt. No. 97-3, ¶36)

On April 11, 2008—the day before the belated entries were allegedly made—a nurse found Mrs. Watson choking on her food. (Def. Facts ¶72) The nurse initiated the Heimlich maneuver and dislodged the obstruction. (*Id.* ¶73) Mrs. Watson was sent to JFK Medical Center for further observation and returned the same day. (*Id.* ¶¶73, 77) Although it is standard protocol to perform a formal reassessment of a resident's condition anytime she requires hospitalization, no such assessment was performed on Mrs. Watson. (*See* Deposition of Eileen Hesse ("Hesse Dep."), Ex. 3, Howard Decl., Dkt. No. 167-5, at 4-5) The nurse who witnessed the April 11 choking incident stated that she completed an Incident Report, but the defendants have been unable to locate or produce it. (*See* Hesse Dep., Ex. 2, Howard Decl., Dkt. No. 167-4, at 4-5)

Mrs. Watson's attending physician, Dr. Arvind Doshi, was informed about the choking incident by telephone the following morning. (*Id.* at ¶79) Dr. Doshi testified at his deposition that he saw no need to examine Mrs. Watson because no one from Brighton Gardens recommended that he do so. (Deposition of Arvind K. Doshi ("Doshi Dep."), Ex. E., Jabbour Cert., Dkt. No. 158-9, at 81). If there were "any [] major issue" regarding Mrs. Watson's health, Dr. Doshi said, a "nurse would tell me...that you need to come and see her." (*Id.*)

A few days later, on April 14, 2008, Mrs. Watson was reportedly observed "leaning to one side and looking tired." (Expert Report of Gail King, R.N., Ex. 27, Howard Decl., Dkt. No. 167-29, at 11) Mr. Watson asserts that there is no evidence that nursing staff subsequently reassessed Mrs. Watson's condition or notified Dr. Doshi.

Mrs. Watson fell twice more, once on April 16 and and once on April 17, 2008. An Incident Report was filed after the second fall, but Dr. Doshi was not notified.

On April 27, 2008, Mrs. Watson suffered a second choking episode. (Def. Facts ¶86) It occurred at dinnertime in the Brighton Gardens dining room. The parties dispute whether any of Brighton Gardens' staff members performed the Heimlich maneuver. (Pl. Response to Defs. Statement of Material Facts and Pl. Supp. Statement of Disputed Material Facts Pursuant to L. Civ. R. 56.1 ("Pl. Facts"), Dkt. No. 167-32, ¶89) The defendants contend that the staff "noticed Mrs. Watson standing, realized she was choking, called 911, and administered the Heimlich maneuver." (Def. Facts ¶89) Mr. Watson, however, points to the report of the paramedics who responded to the 911 call, which states that there was "[n]o Heimlich maneuver nor CPR started prior to E-FD's arrival." (Pl. Facts, ¶89)

By the time paramedics arrived, Mrs. Watson had stopped breathing. The paramedics' report describes what they found: "On exam BLS suctioned the airway but unable to clear the airway. CPR was continued while ALS crew suctioned while using laryngoscope. Copious amounts of food found." (*Id.*) The paramedics "extracted a large piece of chicken from Mrs. Watson's throat," placed her on a ventilator, and transferred her to JFK Medical Center. (*Id.* at ¶95) The parties agree that Mrs. Watson was still alive when she left Brighton Gardens. Once she arrived at the hospital, she was attached to a "breathing apparatus." (Def. Facts ¶97)

Before this incident, Mrs. Watson had given a healthcare proxy to Mr. Watson. (Pl. Facts, ¶98) Pursuant to that authority, Mr. Watson decided to remove the ventilator. Mrs. Watson died on April 27, 2008.

The Current Action

Mr. Watson commenced this action on December 7, 2009, in the Superior Court of New Jersey, Middlesex County. The Complaint named as defendants Services, SSLI, and five of SSLI's corporate officers: Daniel Schwartz, James Pope, John Gaul, Lisa Mayr, and Susan Timoner. On January 14, 2010, the defendants[3] removed the case to federal court. (Dkt. No. 1)

Mr. Watson twice amended the Complaint. (Dkts. Nos. 69, 106) The Second Amended Complaint alleges (1) violations of the New Jersey Nursing Home Bill of Rights, N.J.S.A. 30:13-1 *et seq.*, the Federal Nursing Home Reform Amendments of 1987, 42 U.S.C. §§ 1395i, 1396r, and provisions of the N.J.A.C. governing the licensure of assisted living and long-term care facilities, N.J.A.C. §§ 8:36-1.1, *et seq.*, 8:39-1.1, *et seq.*; (2) gross negligence; (3) negligence; (4) medical malpractice and professional negligence; (5) wrongful death; and (6) that the corporate veil should be pierced so that liability extends to Services' parent, SSLI.[4] (Dkt. No. 97-3, at 21)

Defendants Services and SSLI moved for summary judgment on June 13, 2014. (Dkt. No. 158)

_____

[3]     All named defendants joined in the removal notice. (*See* Dkt. No. 1)

[4]     Mr. Watson sought to include a seventh count alleging liability under a participation theory and under N.J.A.C. 8:36-5.2(c). In an Order dated January 8, 2013, however, Magistrate Judge Hammer denied Mr. Watson's motion amend to the Complaint to the extent it sought to add this claim. (Dkt. No. 106, at 33)

## II.   JURISDICTION

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid.*

7

*Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

## IV.   ANALYSIS

### A. The Negligence Counts

Mr. Watson asserts three counts of negligence: gross negligence (Count 2), negligence (Count 3), and medical practice and professional negligence (Count 4). Each essentially alleges that Brighton Gardens' staff violated a duty of care owed to Mrs. Watson, and that this violation proximately caused her injury and death. Services, Mr. Watson claims, is liable for the negligent actions of Brighton Gardens' staff based on respondeat superior.[5]

To prove negligence, a plaintiff must establish: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty of care; and (3) that the defendant's breach proximately caused the plaintiff's injury. *Boos v. Nichtberger,* 2013 WL 5566694, *4 (N.J. Super. Ct. App. Div. Oct. 10, 2013) (citing *Endre v. Arnold,* 300 N.J. Super. 136, 142 (App. Div. 1997)). The difference between "gross" and "ordinary" negligence is "one of degree rather than of quality." *Fernicola v. Pheasant Run at Barnegat,* 2010 WL 2794074, *2 (N.J. Super. Ct. App. Div. July 2, 2010). "Gross negligence refers to behavior which constitutes indifference to consequences." *Griffin v. Bayshore Medical Center,* 2011 WL 2349423, *5 (N.J. Super. Ct. App. Div. May 6, 2011) (citing *Banks v. Korman Assocs.,* 218 N.J. Super. 370, 373 (App. Div. 1987)). Unlike simple negligence, gross negligence requires wanton or reckless

---

[5]     The potential extension of liability to Services' parent company, SSLI, is discussed in section IV.D, *infra.*

disregard for the safety of others. *Griffin v. Bayshore Medical Center,* 2011 WL 2349423, *5 (N.J. Super. Ct. App. Div. May 6, 2011) (citing *In re Kerlin,* 151 N.J. Super. 179, 185 (App. Div.1977)).

Medical malpractice is a kind of negligence. A medical malpractice action is based on the "improper performance of a professional service that deviated from the acceptable standard of care." *Zuidema v. Pedicano,* 373 N.J. Super. 135, 145 (App. Div. 2004); *see generally Sanzari v. Rosenfeld,* 34 N.J. 128, 134-35 (1961); *F.G. v. MacDonell,* 291 N.J. Super. 262, 271-72 (App. Div. 1996), *aff'd in part, rev'd in part on different grounds,* 150 N.J. 550 (1997); 61 *Am. Jur.* 2d, *Physicians, Surgeons, Etc.* § 287 (2002). In a typical medical malpractice action, a plaintiff must establish by expert testimony the applicable standard of care owed by a physician to a patient, a deviation from that standard of care, and that the deviation proximately caused the injuries. *Verdicchio v. Ricca,* 179 N.J. 1, 23 (2004).

The defendants contend that summary judgment must be granted on each of the three negligence claims because the record evidence conclusively establishes that Brighton Gardens and its nursing staff conformed to the duty care. (Def. Mot. for Summ. J. ("Def. Mot."), Dkt. No. 1582, at 12) The defendants state that as a matter of law, "[a]n assisted living provider is not held to the same professional standard of care as a medical doctor, and in fact, is required to obtain, defer to, and follow medical directives from each resident's treating physician before rendering medical treatment." (Def. Mot. at 12) The defendants add that Dr. Doshi's deposition testimony proves that he never ordered anyone at Brighton Gardens to modify Mrs. Watson's treatment. Absent such a doctor's order, they say, they cannot have violated any duty by failing to modify Mrs. Watson's care in a manner that would have prevented either the first or the second choking incident. As additional support, the defendants cite the deposition testimony of Mr. Watson and his medical expert, Dr. Perry Starer.

The defendants present no evidence regarding the other elements of Mr. Watson's negligence claims. Accordingly, the decision to award summary judgment on these claims turns solely on whether Mr. Watson is able to raise a question of material fact concerning the defendants' professed adherence to the applicable standard of care.

The defendants' assertion that an assisted living facility such as Brighton Gardens is not held to the same standard as a physician does not, in itself, rule out negligence. Both assisted living facilities and physicians qualify as "licensed persons" under New Jersey law. *See* N.J.S.A. 2A:53A-26(f), (j); *see also* N.J.S.A. 26:2H-2(a). Any action alleging malpractice or negligence against such licensed persons in their "profession or occupation" must establish that the services rendered "fell outside acceptable professional or occupational standards or treatment practices." N.J.S.A. 2A:53A-27; *see also Zuidema*, 373 N.J. Super. at 145. True, those standards and practices may differ based on the particular profession at issue, but the legal standard for determining liability is the same: failure to conform to the duty of care accepted within the profession.

In that regard, the defendants maintain that the duty of care applicable to an assisted living facility requires no more than "following the protocol" for communicating with a resident's treating physician and faithfully implementing whatever that physician may order. According to the defendants, the nursing staff of Brighton Gardens did just that throughout Mrs. Watson's time as a resident. In short, the defendants argue that it was the doctor's responsibility, not theirs, to evaluate the need for further measures to prevent choking.

Dr. Doshi testified at his deposition that Brighton Gardens' practice was to call him or send him a memorandum if there was any issue with a patient. (Doshi Dep. 32:13-19) If he had been informed that Mrs. Watson had

10

experienced swallowing problems or any other condition that might indicate she was at risk of choking, Dr. Doshi stated, he would have made a notation in his records and ordered some form of evaluation, such as a speech therapy or a swallowing consultation, to determine whether she required any additional treatment. (Doshi Dep. 41:22-25, 42:1) Here, according to the defendants, Dr. Doshi did not conclude that the reports he got from Brighton Gardens merited any further evaluation. (Doshi Dep. 44:22-25, 45:1-4, 47:1-6) Therefore, their argument goes, Dr. Doshi could not have been expected to order Brighton Gardens to implement any measures to prevent Mrs. Watson from choking. And because the Doctor never gave such an order, the defendants insist, they could not have violated any duty of care when they failed to prevent either of Mrs. Watson's choking episodes.

The defendants point to evidence that, after the first choking episode on April 11, 2008, they adhered to Brighton Gardens' medical assessment policies. The nurse on the scene administered the Heimlich maneuver, removed the blockage, and asked a colleague to call 911. (*See* Progress Notes, Ex. G, Jabbour Cert., Dkt. No. 158-10, at 7-8) Dr. Doshi was notified by phone the following day that Mrs. Watson had choked. (Doshi Dep. 63:3-6) Aven after learning that Mrs. Watson had been hospitalized, Dr. Doshi believed it was unnecessary to visit and examine her. (Doshi Dep. 81:13-19) He testified that choking was a relatively common occurrence—"food will go through the wrong pathway sometimes"—and that one instance of choking did not establish any "issue with swallowing trouble." (Doshi Dep. 41:2-3, 81:13-19) Dr. Doshi testified that it would have been premature to order speech therapy or a swallowing consultation—or any other potentially preventative diagnostic—after a single episode of choking. (Doshi Dep. 81:23-25, 82:1-6) Passing the responsibility back to the defendants, Dr. Doshi testified that such a move would be necessary only if "the caregiver feels that [a resident] has problems swallowing and if there is a recurrent episode." (Doshi Dep. 81:23-25, 82:1-6) At least at this point, the defendants say, neither a swallowing problem nor a

recurrent episode was present. Since it was Dr. Doshi's medical opinion that the type of care given to Mrs. Watson was sufficient, the defendants argue that they cannot be held liable for failing to prevent Mrs. Watson's second, fatal choking episode.

As additional support, the defendants point to Mr. Watson's own deposition testimony. Mr. Watson testified that, after the first choking episode, he visited Mrs. Watson and considered her to be "fine." (Deposition of David Watson ("Watson Dep."), Ex D., Jabbour Cert., Dkt. No. 158-7, 97:4, 98:13-16) Defendants also cite the testimony of Dr. Starer that a speech therapy evaluation was not medically necessary after Mrs. Watson's first choking incident. This medical testimony, they say, further vindicates the actions of Dr. Doshi and Brighton Gardens. (Deposition of Dr. Perry Starer, Ex. H, Jabbour Cert., Dkt. No. 158-11, at 98)

When the second choking episode occurred on April 27, 2008, the defendants say, Brighton Gardens' staff again adhered to the medical assessment policies. A nurse administered the Heimlich maneuver (though this is disputed) and called 911. (Deposition of Merleine Fredrick, Ex. I, Jabbour Cert., Dkt. No. 158-12, 21:20-25, 22:1-25) Mrs. Watson was transported to JFK Medical Center for further treatment, and Mr. Watson was immediately notified by telephone of what had happened. (Watson Dep., 132:9-11, 134:16-25)

In sum, the defendants argue that Brighton Gardens followed its internal protocols and the instructions of Dr. Doshi. That, they say, is sufficient to discharge the duty of care imposed on an assisted living facility when caring for a resident. After reviewing the record, however, I find that Mr. Watson has successfully raised a factual dispute regarding whether or not the defendants met this burden.

There is a certain circular quality to the defendants' argument. To take an extreme and hypothetical example, if a care facility completely failed to report an injury to the doctor, it could not disclaim liability because the doctor had failed to prescribe any treatment. Here, the defendants exculpate themselves by pointing to advice (or lack of advice) from Dr. Doshi. But Dr. Doshi's advice relied on the defendants' accurately reporting the medically relevant facts to him.

The defendants' argument that Brighton Gardens was powerless to alter Mrs. Watson's treatment between the first and second choking episodes begs that informational question. As Dr. Doshi testified, he was "relying on the nurses to provide [him] with the information [he] need[ed] in order to place physician's orders for [Mrs. Watson]." (Doshi Dep., 60:15-19) If, as Mr. Watson submits, the defendants negligently failed to provide that information after the April 11, 2008 episode, then Dr. Doshi would have been ill equipped to give appropriate orders regarding her care.

Has Mr. Watson submitted evidence sufficient to create an issue of fact as to the defendants' accurate and complete reporting of the April 11, 2008 episode to Dr. Doshi? I believe he has.

Brighton Gardens' policy was to evaluate a resident's medical condition any time she was admitted to the hospital and returned to the facility. Eileen Hesse, a registered nurse who worked at Brighton Gardens, testified that if a resident "went out to the emergency room for an evaluation and then they returned, there would be some sort of assessment." (Hesse Dep., 96:18-20) According to Hesse, this evaluation would consist of "a head-to-toe physical assessment" focused on the "reason that that the [] resident went out to the hospital." (*Id.* at 97:6-9, 97:22-23, 98:16-18) No such assessment appears to have been conducted after Mrs. Watson returned from the hospital after her first choking episode. (Deposition of Kimberly Walling, Ex. 5, Howard Decl.,

167-7, at 35:4-18, 36:15-20) Indeed, Dr. Doshi testified that apart from the initial phone call he received after Mrs. Watson had been taken to the hospital, no one from Brighton Gardens ever followed up with him about her condition. (Doshi Dep., 64:12-25, 65:1-14)

Mr. Watson contends that this lapse in evaluation and reporting prevented Dr. Doshi from effectively supervising his mother's care. Dr. Doshi testified that if the nursing staff had "let [him] know...there is a problem with any [] swallowing," then would have ordered a speech therapy evaluation. (Doshi Dep., 48:11-20) But because the nursing staff never evaluated Mrs. Watson after she first choked, Mr. Watson says, there was no way for Dr. Doshi to know whether the choking episode was an isolated incident or evidence of a growing inability to swallow. As Mr. Watson's expert registered nurse, Gail King, writes her in report: "There were no further progress notes written that monitored [Mrs. Watson] after [the first choking] episode nor did the nursing staff speak with the physician about utilizing the services of the in-house speech-language pathologist to assess Mrs. Watson's swallowing skills which can often deteriorate with Alzheimer's disease." (Expert Report of Gail King ("King Report"), R.N., Dkt. No. 167-29, 11)

Mr. Watson documents other apparent failures in Brighton Gardens' communication with Dr. Doshi. On April 14, 2008, the Daily Log notes that Mrs. Watson was "leaning to the side a bit and looking very tired." (Daily Log April 2008, Ex. 21, Howard Decl., Dkt. No. 167-23, at 6) Although the entry states that the staff "notif[ied] team members and [the] nurse" (id.), there is no evidence that any further action was taken or that Dr. Doshi was notified. Dr. Doshi testified that this is exactly the kind of information that he would expect the nurses to report to him, because it could be indicative of a "minor stroke" or a "medication side effect." (Doshi Dep., 65:15-24, 66:2-4)

14

Additionally, Mr. Watson points to evidence that Brighton Gardens failed to follow its own Incident Report policy. Nurse Hesse testified that she prepared an Incident Report following the first choking episode and "left it in the nurse's station." (Hesse Dep., 28:3-5). Throughout the course of this litigation, however, the defendants have been unable to locate this document. (*See* ¶3, Howard Decl.) The Court must construe all facts and inferences in the light most favorable to Mr. Watson. *See Boyle*, 139 F.3d at 393. For purposes of this analysis, then, I will assume that no Incident Report was created following Mrs. Watson's first choking episode—a clear violation of Brighton Gardens' policy.

Rounding out the picture, both of Mr. Watson's experts—Nurse King and Dr. Starer—have submitted opinions that these oversights violated the duty of care and proximately caused Mrs. Watson's second, fatal choking episode.

Nurse King testified that after the first choking episode, the nursing staff should at least have finely cut Mrs. Watson's food for her and watched her eat to determine whether she continued to experience swallowing issues. That would have minimized the risk of choking at least until Dr. Doshi—assuming he had been properly informed—could order a speech therapy evaluation. (Deposition of Gail King, R.N., Ex. 28, Howard Decl. 67:22-69:23) Such simple commonsense precautions did not require medical authorization. Nurse King's report identifies a number of lapses by the Brighton Gardens staff: "Lack of communication by the staff at all levels to ensure her basic needs were met"; "Lack of reassessment by the staff once physical or behavioral changes were observed"; "Lack of timely follow-up intervention to ensure her health & safety"; "Lack of timely and/or consistent documentation to ensure staff were aware of her needs or changes demanded due to these needs"; and "Lack of timely notification to physicians with changes in her condition." (King Report, Dkt. No 167-29, at 13-14) The report states that these failures and oversights "caused direct harm and injury" to Mrs. Watson and "contributed to her death." (*Id.* at 14)

Dr. Starer, the expert physician, agreed with Nurse King's conclusions. He found that Mrs. Watson's second, fatal choking could have been prevented had Brighton Gardens observed a reasonable degree of care:

> As a foreseeable result of the staff of Brighton Gardens of Edison not providing care to prevent aspiration, Ms. Watson aspirated on April 26, 2007. Ms. Watson's history of aspiration was known to the staff of Brighton Gardens of Edison. Ms. Watson required aspiration precautions. She should have been maintained in an upright position during and after meals. Food of appropriate size and consistency should have been provided...There is no evidence that Ms. Watson was properly assessed or monitored.
>
> ...
>
> As a result of the staff of Brighton Gardens of Edison not properly providing care to prevent aspiration, Ms. Watson aspirated. As a result of choking on food, her airway was obstructed. As a result of her airway being obstructed, she suffered cardiac arrest and died...Brighton Gardens of Edison failed to ensure that Ms. Watson received appropriate routine medical and nursing care[.]
>
> ....
>
> Brighton Gardens of Edison's failure to comply with the applicable standards of care caused, within a reasonable degree of medical certainty, Ms. Watson to aspirate, suffer cardiac arrest and die...These injuries to Ms. Watson could have, within a reasonable degree of medical certainty, been prevented if the standards of care had been followed.

(Starer Report, Ex. 8, Howard Decl., Dkt. No. 167-10, at 6)

Finally, Mr. Watson notes that Brighton Gardens failed to follow its Choking or Blocked Airway policy during Mrs. Watson's second choking incident. That policy instructs the nursing staff to "[c]lear the resident's airway immediately if the resident is not able to talk or cough by performing the emergency procedure for choking." (Choking or Blocked Airway, Ex. 25, Howard Decl., Dkt. No. 167-27, at 2) Brighton Gardens asserts that staff

members "administered the Heimlich maneuver" immediately after realizing Mrs. Watson was choking. (Def. Facts ¶89) But the paramedics who responded to the 911 call recorded in their report that "No Heimlich maneuver or CPR started prior to E-FD's arrival." (Patient Care Report, Ex. 7, Howard Decl., Dkt. No. 167-9, at 2)

I do not suggest, of course, that the evidence marshaled by Mr. Watson compels judgment in plaintiff's favor. But it is more than sufficient to raise a question of material fact regarding whether the defendants followed the duty of care, and therefore, to preclude summary judgment in the defendants' favor. The defendants' motion for summary judgment is thus denied as to Mr. Watson's claims for gross negligence (Count Two), negligence (Count Three), and medical practice and professional negligence (Count Four).

## B. Punitive Damages

Mr. Watson seeks punitive damages on all three negligence counts. The defendants argue that even if the Court does not grant summary judgment on those counts in their entirety, it should nonetheless grant partial summary judgment to the extent that they seek punitive damages. The defendants claim that, as a matter of law, the conduct alleged by Mr. Watson simply does not rise to the level of culpability required to impose punitive damages.

The Punitive Damages Act ("Act") governs claims involving punitive damages. N.J.S.A. § 2A:15-5.9-5.17. Under the Act, a New Jersey court may award punitive damages only if:

> [T]he plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This

burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. § 2A:15-15.2(a). The Act defines "actual malice" as an "intentional wrongdoing in the sense of an evil-minded act" and "wanton and willful disregard" as a "deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. § 2A:15-15.10.

A court should therefore award punitive damages "only where the evidence shows that the defendant knows or has reason to know of facts that create a high risk of physical harm to another and deliberately proceeds to act in conscious disregard or, or indifference to, that risk." *Sipler v. Trans Am Trucking, Inc.*, 2010 WL 492393, at *3 (D.N.J. Nov. 30, 2010) (citing *Burke v. Massen*, 904 F.2d 178, 181 (3d Cir. 1990)). It is "not enough to show that a reasonable person in the defendant's position would have realized or appreciated the high degree of risk from his actions." *Id.* Rather, "there must be some evidence that the defendant *actually realized* the risk and acted in conscious disregard or difference to it." *Id.* (emphasis added)

Mr. Watson alleges that the defendants intentionally decided to understaff Brighton Gardens, and that this decision "created an environment in which the staff were too busy to pay attention to the residents" or "to monitor their condition and their needs." (Plaintiff's Brief in Opposition to Def. Sum. J. Mot. and in Supp. of Pl. Cross-Motion for Leave to Am. the Compl. ("Pl. Br."), Dkt. No. 167, at 31) His principal evidence in support of this contention is that the defendants failed to replace Jonelle West, the Coordinator of the Reminiscence Unit—the part of the facility specially designed for residents suffering from Alzheimer's where Mrs. Watson had resided since May 2006—after she filed for disability in April 2008 and took a leave of absence. (*See* Pl. Facts, ¶163) Mr. Watson states that instead of hiring someone to fill this

18

supervisory position, the defendants "requir[ed] instead that others cover for her absence and effectively le[ft] no one in charge." (Pl. Br., at 31) He charges that had West been replaced, a supervisor would have been present during Mrs. Watson's second choking episode. The decision to not replace West, Mr. Watson says, is part of the defendants' deliberate decision to keep Brighton Gardens understaffed. Further, he maintains that all of the alleged derogations from the standard of care discussed in Section IV.B., *supra*, derived from understaffing.

I find that this issue is not suitable for resolution on summary judgment based on this record. Certainly punitive damages are not prohibited as a matter of law. Striking down an exculpatory contractual clause that precluded punitive damages, the Appellate Division has stated that "[t]he preclusion of punitive damages touches upon the societal interest of expressing the community's disapproval of outrageous conduct. In the context of nursing home abuse, punitive damages also serve an 'admonitory' function." *Estate of Ruszala v. Brookdale Living*, 415 N.J. Super. 272, 298 (App. Div. 2010). The issue is a fact-sensitive one that may depend on the evaluation of witness testimony. While defendants have ample grounds for their opposition to punitive damages, I cannot rule them out under every plausible scenario that may occur at trial.

I therefore deny the motion for summary judgment as to punitive damages. I do so, however, without prejudice to the renewal of these arguments at the close of plaintiff's case or at the close of all the evidence. I further note that, in diversity cases, the Court generally adheres to the state-court procedure of bifurcating the trial, presenting the punitive damages issues to the jury only if, and after, the jury has awarded compensatory damages.

## C. The Statutory Violations

Count One of the Second Amended Complaint alleges that the defendants violated four statutory or regulatory schemes:

- The New Jersey Nursing Home Responsibilities & Rights of Residents Act, N.J.S.A. § 30:13-1 et seq. (the "NHRRRA"),

- The Standards for Licensure of Assisted Living Residences, Comprehensive Personal Care Homes, and Assisted Living Programs, N.J.A.C. § 8:36-1.1 *et seq.* (the "SLALR")

- The Standards for the Licensure of Long-Term Care Facilities, N.J.A.C. § 8:39-1.1 *et seq.* (the "SLLTCF"), and

- The Federal Nursing Home Reform Amendments, 42 U.S.C. § 1396r *et seq.* (the "FNHRA").

The defendants cite a recent decision of this district court which held that the NHRRRA does not apply to assisted living facilities such as Brighton Gardens. *Andreyko v. Sunrise Sr. Living, Inc.*, 993 F. Supp. 2d 475, 481-86 (D.N.J. 2014). Adopting Judge Debevoise's analysis, I will grant summary judgment on Count One to the extent it alleges violations of the NHRRRA.

Of course, disposing of the NHRRRA allegations does not dispose of Count One. I therefore consider the other statute and regulations under which Mr. Watson seeks relief. I hold that they either do not confer a private right of action or do not apply to Mrs. Watson, and therefore I will grant summary judgment on Count One in its entirety.

First, the state regulations. There is no private right of action to enforce the provisions of the SLALR and the SLLTCF. Both are promulgated under Title 8 of the New Jersey Administrative Code. The SLALR, codified at Chapter 36, "establish[es] minimum standards with which an assisted living residence, comprehensive personal care home or assisted living program must comply in

20

order to be licensed to operate in New Jersey." N.J.A.C. 8:36-1.2. It provides that each resident is entitled to an enumerated list of rights, such as "the right to receive a level of and services that addresses the resident's changing physical and psychosocial status," and "the right to be free from physical harm and mental abuse and/or neglect." N.J.A.C. 8:36-4.1. Although this is styled as a list of "rights," the regulation does not promulgate a liability-creating scheme that affords a private right of action against infringers. To the contrary, the SLALR explicitly provides only that the New Jersey Department of Health and Senior Services ("DHSS") can enforce the provisions of this chapter. Typically, DHSS will do so by denying or revoking a facility's license, assessing monetary penalties, or by removing residents from the facility. N.J.A.C. 8:36-2.8, 2.9, 3.5.

The SLLTCF is substantially similar in design. Codified at Chapter 39, it establishes "rules and standards intended to assure the high quality of care delivered in long-term care facilities, commonly known as nursing homes, throughout New Jersey." N.J.A.C. § 8:39-1.1. The rules are "intended for use in State surveys of the facilities and any ensuing enforcement actions." *Id.* The SLLTCF also sets forth a list of rights to which the residents of such facilities are entitled. N.J.A.C. § 8:39-4.1. The only reference to enforcement in this chapter states that "violations of this subchapter may result in act by the Department [*i.e.*, DHSS] in accordance with N.J.A.C. 8:43E." N.J.A.C. 8:39-2.7. That provision, in turn, provides that only "the Commissioner [of DHSS] or his or her designee may impose [] enforcement remedies against a health care facility for violations of licensure regulations or other statutory requirements." N.J.A.C. 8:43E-3.1. Again, there is no provision for a private right of action, and the enforcement provision appears to rule out such a right of action.

Because neither the SLALR nor the SLLTCF may be enforced through private civil litigation, Mr. Watson's claims for violations of those statutes must therefore fail as matter of law.

Finally, Count One alleges a violation of a federal statute, the FNHRA. FNHRA was passed by Congress to provide for the oversight and inspection of nursing homes that participate in the Medicare and Medicaid Programs. 42 U.S.C. §§ 1395i-3(g), 1396r(g). This statute affords nursing home residents certain rights so as to establish minimum standards of care. Like the New Jersey statutes, the FHNRA does not expressly authorize a private cause of action. The Third Circuit, however, has held that a private litigant may seek redress through 42 U.S.C. § 1983 for violations of the rights conferred by FNHRA. *See Grammer v. John J. Kane Regional Centers-Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009).

Nevertheless, FNHRA does not apply here, for several reasons. First, the Third Circuit stated that "Medicaid recipients were the intended beneficiaries of § 1396r." *Id.* at 527. Mr. Watson makes no allegation or showing that his mother was a Medicaid recipient. Second, even if Mrs. Watson did receive Medicaid, violations of the FNHRA can be enforced only through § 1983. Mr. Watson asserts no such claim, nor could he, because Brighton Gardens is a private actor. *See, e.g., Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 283 (E.D.N.Y. 2014) ("Plaintiffs' section 1983 claims would still require proof that the deprivation of their federal rights occurred 'under color of [State] law.' The defendants here are private parties, not state actors, and it is undisputed that at all relevant times the [facility in question] 'was private pay— not Medicaid.'") (internal citations omitted). Finally, the allegations of the complaint and the proofs I have analyzed leave it unclear whether Brighton Gardens, an "assisted living facility" under New Jersey law, *see Andreyko*, 993 F. Supp. 2d. at 481-86, meets the FNHRA's statutory definition of a "nursing home." For these reasons, I conclude that Mr. Watson's FNHRA claim fails as a matter of law.

Summary judgment is granted on Count One in its entirety.

22

### D. Piercing the Corporate Veil

Count 6 of the Second Amended Complaint alleges that SSLI should be held liable for the alleged tortious conduct of Services, its subsidiary. Services, recall, is the licensed operator of Brighton Gardens. Mr. Watson contends that SSLI dominated Services to such an extent that it is permissible for the Court to pierce the corporate veil. The defendants urge the Court to enter summary judgment on this count because, they say, the evidence shows that Services did not abuse the corporate form. I disagree. The evidence presented by Mr. Watson is sufficient to raise genuine, material factual issues regarding the relationship between Services and SSLI.

Piercing the corporate veil is a "tool of equity." *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir.1983). It provides a remedy "when [a subservient] corporation is acting as an *alter ego* of [a dominant corporation.]" *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 171 (3d Cir. 2002) (citations omitted). A plaintiff seeking to pierce the corporate veil bears the burden of establishing that the corporate form should be disregarded. *Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.,* 195 N.J. 457, 472 (2008). Under New Jersey law, the plaintiff must show that (1) "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," and (2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Pharmacia Corp. v. Motor Carrier Services Corp.,* 309 F. App'x 666, 672 (3d Cir. 2009) (quoting *State Dep't of Env. Prot. v. Ventron Corp.,* 94 N.J. 473, 468 (1983)). Factors relevant to piercing the corporate veil include:

> [G]ross undercapitalization ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the

corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown, Inc.*, 296 F.3d at 272.

Whether the veil should be pierced is ordinarily a fact-intensive issue: "The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form." *N. Am. Steel Connection, Inc. v. Watson Metal Products Corp.*, 2010 WL 3724518, at *10 (D.N.J. Sept. 14, 2010) (citations omitted) *aff'd*, 515 F. App'x 176 (3d Cir. 2013).

Mr. Watson persuasively cites deposition and other testimony that suggests that Services functioned as the alter ego of SSLI. Bradley Rush, who from 2005 to 2007 simultaneously served as the Chief Financial Officer of SSLI and the sole member of Services' board of directors, testified that Services had no employees of its own and held no formal board meetings. (Deposition of Bradley Rush ("Rush Dep."), Ex. 9, Howard Decl., Dkt. No. 167-11, at 13:9-10, 16:10-12) Rush testified that Services did not keep its financial books and records separate from those of SSLI. (*Id.* at 35:11-13) He further stated that the money generated by the assisted living facilities operated by Services was routinely "swept into a centralized account at the bank of [SSLI's Virginia] location." (*Id.* at 24:21-25, 25:1-2) Although Services formally maintained its own bank accounts, it did not retain "any portion" of the revenue generated by the assisted living facilities. (*Id.* at 25:8-10) Instead, Rush said, when Services needed to pay its staff or make other expenditures, "funds would be swept back down from [SSLI's] centralized account to cover that." (*Id.* at 28:1-7). Typically, however, Services' bank accounts "were always maintained at zero." *Id.* at 28:4-18) Rush also testified that SSLI determined the staffing levels at the facilities operated by Services, like Brighton Gardens. (*Id.* at 30-31) For these reasons, Rush maintained that SSLI and Services "acted as the alter ego of each other,"

and that SSLI "completely dominated and controlled the activities and finances of…Services." (*Id.* at 33:12-19)

Richard Nadeau, who succeeded Rush as the Chief Financial Officer of SSLI, gave trial testimony in a separate action against SSLI that corroborates Rush's deposition testimony.[6] Nadeau testified that he was unable to estimate the worth of Services because he said, referring to SSLI, "we don't keep the books and records of the corporation that way. We keep the records at the consolidated level." (Testimony of Richard Nadeau, Ex. 11, Howard Decl., Dkt. No. 167-13, 6:19-26) Nadeau, like Rush, stated that all of the revenue generated by Services through its assisted living facilities is deposited into an account controlled by SSLI, and that SSLI then decides how those funds will be allocated. (*Id.* at 14-15) Nadeau could not recall if Services ever paid a dividend to SSLI. (*Id.* at 13) Furthermore, although he was an officer of SSLI, Nadeau also performed work on behalf of Services. (*Id.* at 10:12-14)

The former executive director of Brighton Gardens, Nelson Duran, testified at his deposition that he had never heard of Services, even though it held the license for the facility he oversaw. (Deposition of Nelson Duran, Ex. 14, Howard Decl. Dkt. No. 167-16, 11:12-14) He also testified that he received "training regarding procedures and protocols" to be used at Brighton Gardens at SSLI's office in Virginia. (*Id.* at 9:16-25, 10:1-15) According to Duran, Brighton Gardens' entire policy manual was prepared by SSLI. (*Id.* at 49:4-16).

---

6    Nadeau was called to testify on behalf of SSLI on May 14, 2008 in the case of *Adams v. Villa Valencia Health Care Center and Sunrise Senior Living, Inc., et al.*, in the California Superior Court of Orange County (Case No. 05CC13199).

This transcript may constitute admissible hearsay in its own right. It is a statement "made by a person whom the party authorized to make a statement on the subject," and also, because it is a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(C)-(D). SSLI's Form 8-K, dated May 29, 2009, confirms that Nadeau was CFO of SSLI when he gave the testimony quoted in the text. (*See* Ex. 12, Howard Decl., Dkt. No. 167-14). At the very least, this transcript may be considered, like an affidavit, as a sworn statement of a person who could presumably be called as a witness.

That point was reinforced by Thomas Kessler, SSLI's Area Manager of Operations in New Jersey. Kessler testified that SSLI set the policies to be used at the facilities operated by its subsidiaries and then took steps to ensure compliance with those policies. (Deposition of Thomas Kessler, Ex. 13, Howard Decl., Dkt. No. 167-15, 20:7-25, 22:18-23:2, 35:13-17, 45:16-47:13)

The defendants protest that SSLI and Services have not "abused" the corporate form. However, they offer scant evidence to contradict the testimony marshalled by Mr. Watson. There is the declaration of Susan Timoner, the Vice President of Services, which states that although SSLI "has overarching goals for its subsidiaries (as would any parent company)," it has "no involvement in the day-to-day operations or management" of Services. (Declaration of Susan Timoner, Ex. J., Jabbour Cert., Dkt. No. 158-13, ¶¶20, 30) Timoner's declaration also states that SSLI and Services each have their own officers and boards of directors, and that Services "maintains bank accounts in its name and issues W-2s to its thousands of employees." (*Id.* at ¶¶11, 13)

In support, the defendants submit copies of W-2s issued by Services as well as what are described as Services' financial records and bank statements. I find problems with each piece of evidence. The W-2s do list Services as the employer, but the address listed is that of SSLI. (Ex. N, Jabbour Cert., Dkt. No. 158-17) The alleged financial statements are two Independent Auditors Reports for the period between 2005 and 2008. (Ex. L, Jabbour Cert., Dkt. No. 158-15) Inexplicably, both reports consist of balance sheets that are completely devoid of financial figures. There are, for example, no dollar amounts listed for "Total assets" or "Total liabilities"; indeed, there are no dollar amounts listed in *any* rows or columns. (*Id.*) The alleged statement from Services' bank account is similarly perplexing. (Ex. M., Jabbour Cert., Dkt. No. 158-16) It is completely redacted, and contains no information of any kind.

I do not suggest that defendants' evidence could not be believed or credited. But in light of the evidence presented, I find that Mr. Watson has raised material factual questions of fact regarding both prongs of the veil-piercing test.

As to the first prong, a reasonable jury could find that Services was merely a conduit for SSLI: for example, Services allegedly failed to hold board meetings or pay dividends, Services allegedly does not keep independent financial records, SSLI allegedly diverted all of Services' revenue into its own bank account, and SSLI allegedly trained and supervised Services' staff. *See Foodtown, Inc.*, 296 F.3d at 272.

As to the second prong, "abuse" of the corporate form, the evidence is likewise sufficient to raise a factual issue. The United States Court of Appeals for the Third Circuit has stated "the hallmarks of ... abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent, and even more importantly, the undercapitalization of the subsidiary rendering it judgment proof." *Pharmacia Corp.*, 309 F. App'x at 673 (quoting *OTR Assocs. V. IBC Servs., Inc.*, 353 N.J. Super. 48 (App. Div. 2002)). Testimony cited by Mr. Watson suggests that Services was merely a shell that licensed and operated assisted living facilities for the benefit of SSLI. There is also evidence that Services remits all of its revenue to SSLI, has no substantial assets, and therefore is judgment-proof. That evidence is sufficient to permit a reasonable jury to conclude that SSLI abused the privilege of incorporation by using Services "to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Pharmacia Corp.*, 309 F. App'x at 672.

Accordingly, the defendants' motion for summary judgment on Count 6 is denied. The issue of piercing the corporate veil is one for the finder of fact.

## V.    CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

An appropriate order will issue.

KEVIN MCNULTY, U.S.D.J.

Date:  July 17, 2015